[No. S056391. Dec. 28, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
BOB RUSSELL WILLIAMS, JR., Defendant and Appellant.

## COUNSEL

Charles M. Bonneau, Jr., under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Eric L. Christoffersen, Stephen G. Herndon and Craig S. Meyers, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MORENO, J.**—Defendant Bob Russell Williams, Jr., pleaded guilty to one count of murder. (Pen. Code, § 187.)[1] He admitted the special circumstances of committing the murder in the course of a rape (§ 190.2, subd. (a)(17)(C)) and of a burglary (*id.*, subd. (a)(17)(G)), but did not admit to the charged sodomy special circumstance. He also pleaded guilty to five counts of burglary and one count of attempted escape. At the penalty phase, the jury fixed the penalty for the murder at death. The trial court denied defendant's motion to modify the death verdict (§ 190.4, subd. (e)) and sentenced defendant to death.

Defendant's appeal is automatic. (§ 1239, subd. (b).) We affirm this judgment in its entirety.

### I. STATEMENT OF FACTS

#### A. *Prosecution Evidence*

After defendant entered the above mentioned plea on June 4, 1996, the penalty phase trial commenced. The circumstances of defendant's rape and murder of Mary Breck were the centerpiece of the prosecution's case. That evidence, based largely on statements made by defendant after his arrest, discloses the following circumstances. On October 27, 1994, defendant noticed the Breck residence during a morning walk along a canal bank that ran behind the residence. He entered through the unlocked front door, heard a hairdryer blowing in another room, and stole a wallet from a purse lying on the kitchen counter. He emptied the wallet and threw it in the trash in a park, keeping the credit cards.

He then committed a burglary of the Elliott household nearby. Brandie Barnden, the daughter of the owners of the house, who was staying there with

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

her husband, returned to the house around 10:30 a.m., while defendant was still in the house, noticed various books of matches on the floor, and heard someone else pick up the telephone when she was about to call her mother. She promptly left the house and called the police. The police arrived on the scene and Joe Elliott, the homeowner, eventually confirmed that a handgun was missing from the bedroom. Other guns and a black duffel bag containing fishing tackle and a knife were also missing but were found a short distance from the Elliott house.

Defendant lived at the time with his girlfriend, Tina Meagher, with her mother, Deanna Meagher, and with Tina's brother. Deanna Meagher received a phone call at work about some burglaries in the area and returned home to talk to defendant. She made clear to him that she "would call the authorities because she wasn't going to put up with anything." She pretended to call a police detective whose card she had and to leave a message for him. This upset defendant. According to defendant's testimony and his statements to Detective Legg, who interviewed him shortly after his arrest, he took her to mean that she suspected him of being involved in the burglaries and believed the police were "going to get him." After this brief discussion, defendant left, stating that he was going to check on a job.

According to his statement to Detective Legg, defendant left the Meagher house around 9:30 a.m. and returned to the Breck house with the credit cards he had stolen from the house the previous day. He noted the absence of a white pickup truck that the cards he had stolen informed him was owned by the residents of that address. Defendant knocked, and Mary Breck came to the door wearing a green nightgown. She returned wearing a sweater. He gave her the missing credit cards and she gave him $5. Breck said that her driver's license was missing and she would like to see that returned as well. Defendant walked back to the park and retrieved the license from the trash can where he had disposed of it the day before.

When defendant returned, Breck again answered the door. He pushed her down as hard as he could, made her crawl into the living room, and tied her hands with a telephone cord. She pleaded with him not to be hurt and said she would do anything, whereupon defendant tied a bandana around her mouth to keep her quiet. He pulled her into the bedroom, and cut her clothes off with a knife he had been carrying, in order to embarrass her. Defendant testified that he did not cut Breck with a knife and had no explanation for photographs showing that Breck's hands were cut.

According to his statement to Detective Legg, once Breck lay naked on the floor he "noticed her pussy," which excited him, and he proceeded to pull down his pants and forcibly rape her. When asked why he did so, he said that

he "just wanted to hurt her." Defendant related to Detective Legg that he did not think the rape had hurt Breck, so he sodomized her "two or three times." Defendant fondled and licked her breasts, and rubbed his penis on them. When he ejaculated, his penis was not inserted.

Defendant then blindfolded Breck by tying strips of pillowcase around her eyes. He took a belt that was lying on a chair in the bedroom and put it around her neck, pulling on it for five minutes until his muscles could not pull anymore. He believed he had killed her but then heard gurgling sounds in the bedroom. He returned to the bedroom, and strangled her with the belt as hard as he could for "what seemed like another 15 minutes" until he was certain she was dead. He then dragged her body outside because he wanted "to look around the residence for things to steal [and] did not want to hear the gurgling noise again." Defendant took a portable television, a camcorder, and the keys to a Lexus parked in the garage.

Breck's body was discovered around 2:00 p.m. by Susan Reese, Breck's sister-in-law. Blood samples taken on the scene were consistent with the victim and not with defendant. Tests of Breck's body for semen were inconclusive. Detective Legg arranged to have a "sex kit" done on defendant, and a penile swab test tested negative for glycogenetic epithelial cells, an indicator of vaginal contact, as well as negative for fecal material.

Defendant testified that he took fishing poles from the victim's garage, as well as the car. According to his testimony, he took these items because he "realized something wrong [had] happened, and [he] just needed to get away from people . . . and figure out what to do." Defendant testified that he drove back to the Meagher house, where he picked up his clothes, a gear bag and the .38-caliber special handgun he had stolen from the Elliott house.

Defendant left Bakersfield for the Kern River canyon, where he fished for several hours. After defendant resumed the drive, the stolen Lexus was spotted by the California Highway Patrol, and, after a high-speed chase, defendant was apprehended.

Also part of the prosecution's case was the victim impact evidence concerning the effects of Mary Breck's murder on her husband and two children. The entire family went through bouts of depression. Breck's son, a high school senior and an exceptional student, stopped attending classes and failed to graduate from high school. Her daughter was sleeping 15 to 18 hours a day and was having nightmares. Steven Breck testified to his difficulty coping with the death of his wife, with whom he had had a 26-year relationship, whom he described as his "one and only love." Breck's brother and niece also testified about the pain of losing her.

B. *Defense Evidence*

The defense case in mitigation consisted principally of evidence of the abuse defendant suffered as a child, primarily from his stepmother, and of his own mother's neglect. Six months after defendant was born, his parents separated. According to the testimony of his mother, Jennifer McNees, defendant's father Bob Williams, Sr., was abusive to her in the presence of the children. He retained custody of defendant in Louisiana, and defendant was cared for by his paternal grandparents and great-grandmother. When defendant was five years old, he went to live with his father and stepmother after his father remarried. His stepmother had a son one and one-half years older than defendant.

Soon thereafter, they moved to Virginia. Joan Nelson, who was a social worker in Roanoke County, Virginia, helped to document the abuse of defendant, which led to his placement in foster care in 1983 when he was seven. The investigation uncovered a pattern of abuse at the hands of defendant's stepmother. This included locking defendant out of the house, denying him water, forcing him to eat hot peppers if he lied, cutting his clothes off of him, and rubbing his face in urine when he urinated on the floor. Defendant had reported to school authorities in Louisiana that his stepmother had hit him with her fist, a report confirmed by an interview with the stepmother. Nelson observed semicircular bruises on defendant's buttocks consistent with beatings with a folded belt. Defendant testified and had stated in a 1983 interview that he had been confined to the basement, was often fed only peanut butter sandwiches or not given food, and that he had to sometimes eat food placed on the floor "like a dog." According to the defendant's testimony at trial, if he told his parents a lie, he would have to eat a teaspoon of Tabasco sauce, and his stepmother changed the rule to eating the whole bottle. He was made to take cold baths.

Defendant also testified that his stepmother had sexually abused him, that she touched his penis and had him touch her private parts. Dr. Eugene Couture, a clinical psychologist who examined defendant, testified defendant had told him that his stepmother made him suckle at her breast as punishment and was made to conduct oral sex on her. Defendant's mother also testified that he had admitted to her sometime prior to the murder that his stepmother had sexually abused him, although he did not go into details.

Defendant's stepmother was charged with felony child abuse and pled guilty to a misdemeanor offense of child neglect in 1983. Defendant was placed in a foster home, and his foster parents reported that during visits his stepmother was "hateful" to him, and that his father kept him waiting all day for a visit.

Dr. Carol Logan, testified that she conducted psychological testing on defendant while he was in foster care, which showed that he had an above-average IQ of 119. But she concluded that defendant had suffered from serious emotional abuse to which he responded with "aggressive acting out."

When his foster parents moved out of state later in 1983, defendant returned to his father and stepmother's house. According to defendant, the abuse began again. On one occasion defendant's stepmother ordered him to strip naked and tied him to the bed because he could not spell the word "trespass," then went to a ballgame with her son. Social worker Ellen Groff, who had worked for the Roanoke Department of Social Services, testified that defendant was found around this time at a shopping center five miles from his home with a black eye that had been inflicted a week earlier. He had reported to her that after discovering blood on his shirt, the result of having been nipped in the ear by a puppy, his stepmother ordered him to take his clothes off, tied him in bed by his feet with a rope, and threatened to kill him if he left. He had nonetheless escaped.

Defendant was again removed from his home and, after briefly being placed again in foster care, was sent to California to live with his mother. Chali Houghteling, defendant's half sister, testified that her mother did not try to help defendant with his problems and had tried to give defendant to a neighbor. Defendant got into fights and did not pay attention in school. Defendant's mother called the police when it was found defendant had "jammed" his half sister Stacey Lorraine with a pair of scissors, leaving a slight mark on her hand. His mother expected to pick him up at juvenile hall later that night, but instead he spent over a year in the Children's Home of Stockton.

When he returned to his mother's home, she had remarried. In November of 1988 when defendant was 12, he took a bicycle, a fishing pole, some military medals and a camera belonging to his mother's husband and ran away from home. He eventually returned home and ran away again. This time his mother refused to allow him to return to the house and told the police to take him into custody. He spent the next five years in group homes and juvenile hall. His mother seldom visited him. In 1993–1994, while attending his senior year in high school, he lived with his younger half brother Timmy in the house his mother had formerly occupied in Bakersfield. Timmy testified that defendant and he were best friends and that defendant looked after him. They lived there without adult supervision except for visits by defendant's older sister.

Various mental health professionals testified on defendant's behalf. Dr. Eugene Couture testified that defendant was competent to stand trial and

legally sane, and that there was no evidence of brain damage. He opined that the most appropriate diagnosis for defendant was antisocial personality disorder, a disorder characterized by a "pervasive pattern of disregard and violation of the rights of others." People diagnosed with this disorder typically were abused as children.

Defendant also presented various character evidence. Defendant met Tina Meagher at a dance and shortly thereafter Tina became pregnant by him. Their son was born March 15, 1995, after defendant was jailed for the Breck murder. Tina testified that defendant before the murder had expressed the desire that they raise the baby together and would attend obstetrician's appointments with her. Defendant did not physically or sexually abuse Tina. She described him as "very polite, kind, nice." Defendant also got involved in country western dancing and bull riding, and witnesses who participated with him in those activities testified to having a good opinion of him. Michael Chambers, a cellmate of defendant in early 1995, while defendant was awaiting trial, testified that defendant showed remorse for his crimes.

Defendant himself testified that when committing the murder, he had thoughts of what his stepmother had done to him, and was reacting to those thoughts. Defendant testified that he was "real angry" with himself and "sorry."

## II. Discussion

Because defendant pleaded guilty and does not contest the validity of that plea, all of his claims pertain to the penalty phase of the trial.

### A. *Failure to Appoint* Keenan *Counsel*

Defendant claims that the trial court's revocation of the appointment of cocounsel, also known as *Keenan* counsel, constituted error. (*Keenan v. Superior Court* (1982) 31 Cal.3d 424 [180 Cal.Rptr. 489, 640 P.2d 108] (*Keenan*).)

#### 1. *Factual Background*

Defendant's previous counsel, Kyle Humphrey, moved on December 15, 1994, to have Larry Fields appointed as *Keenan* counsel. Humphrey, in his declaration, emphasized that this was a capital case and there would be an "enormous amount of legal services involved" in the preparation of motions for the guilt and penalty phases. The motion was granted and Fields was appointed cocounsel.

On July 12, 1995, Humphrey and Fields filed a motion to be relieved as counsel on the grounds of conflict of interest due to prior representation of a potential witness. The motion was granted on July 14, 1995, by Judge Jerold Turner. At the same time Judge Turner appointed in their places Dominic Eyherabide as lead counsel and Michael Dellastritto as cocounsel.

During a hearing on a motion to continue the trial date, Judge Oberholzer noted the lack of any request for cocounsel on Eyherabide's part or any affidavit in support of such request pursuant to section 987, subdivision (d), and asked for such documentation.

Judge Oberholzer ultimately denied the request for *Keenan* counsel. He stated that he did not "find anything sufficiently complex" that would warrant appointment of cocounsel. The court noted that the guilt phase would "not be particularly involved" because of defendant's confession, and that counsel's efforts "have to be directed to the penalty phase." Counsel responded that the guilt phase might become more involved due to potential mental state defenses, and that in any case the penalty phase would be extensive, in part due to the prosecution's litigation of defendant's past criminal activity. The trial court expressed the view that much of the required preparation could be done by an investigator rather than by second counsel and denied the motion.

### 2. *Applicable Law*

In *Keenan, supra,* 31 Cal.3d 424, 432, we explicitly recognized that a trial court may under some circumstances abuse its discretion by failing to appoint second counsel in a capital case. *Keenan* was in part codified in section 987, subdivision (d), which states: "In a capital case, the court may appoint an additional attorney as a cocounsel upon a written request of the first attorney appointed. The request shall be supported by an affidavit of the first attorney setting forth in detail the reasons why a second attorney should be appointed. Any affidavit filed with the court shall be confidential and privileged. The court shall appoint a second attorney when it is convinced by the reasons stated in the affidavit that the appointment is necessary to provide the defendant with effective representation. If the request is denied, the court shall state on the record its reasons for denial of the request."

Defendant contends the trial court erred in revisiting and overturning the decision of a previous judge to authorize *Keenan* counsel. (See *People v. Riva* (2003) 112 Cal.App.4th 981, 991 [5 Cal.Rptr.3d 649] [generally one trial judge may not overrule another one].) But even if Judge Oberholzer exceeded his jurisdiction in revoking the appointment of *Keenan* counsel, such error is not a basis for reversing the judgment.

"The appointment of a second counsel in a capital case is not an absolute right protected by either the state or the federal Constitution.

(*People v. Jackson* (1980) 28 Cal.3d 264, 286–288 [168 Cal.Rptr. 603, 618 P.2d 149]; *Keenan*[, *supra*,] 31 Cal.3d [at pp.] 428–430 [180 Cal.Rptr.3d 439, 640 P.3d 108].) Thus, the error, if any, . . . must be judged under the standard enunciated in *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], i.e., whether it is 'reasonably probable' a result more favorable to the defendant would have been reached had the error not occurred." (*People v. Clark* (1993) 5 Cal.4th 950, 997, fn. 22 [22 Cal.Rptr.2d 689, 857 P.2d 1099].)

Defendant claims that the trial court's action in revoking appointment of *Keenan* counsel was in excess of its jurisdiction and was structural error, whereas if the trial court had merely abused its discretion—for example, if the first judge to consider the request had incorrectly determined that *Keenan* counsel was not warranted—harmless error analysis would apply. But the fact that the trial court allegedly exceeded its jurisdiction, rather than abused its discretion does not change the fact that it is subject to harmless error analysis under the *Watson* standard. *Arizona v. Fulminante* (1991) 499 U.S. 279, 310 [113 L.Ed.2d 302, 111 S.Ct. 1246], cited by defendant, does not support his position. That case recognizes certain structural errors not subject to harmless error analysis, such as the total deprivation of the right to counsel, the exclusion of members of a race from the grand jury, denial of the right to self-representation at trial, or denial of a public trial. "Each of these constitutional deprivations is a similar structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. 'Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.' " (*Ibid.*) But defendant fails to explain why the erroneous deprivation of *Keenan* counsel that results from excess of jurisdiction as opposed to abuse of discretion should be considered structural error requiring reversal. We will therefore review the revocation of *Keenan* counsel for prejudice under *Watson*'s "reasonably probable" standard.

Defendant claims two different types of prejudice. First, he contends that defense counsel pressured him to plead guilty because the lack of resources would have made it virtually impossible for counsel to conduct both the guilt and penalty phases. Although the evidence that defendant committed the murder is overwhelming, defendant contends that there were meritorious mental state defenses that might have lessened his culpability at the guilt phase.

The record does not support defendant's claim. Prior to accepting defendant's guilty plea, the prosecutor, District Attorney Edward Jagels, had a colloquy with Defense Counsel Eyherabide. The prosecutor asked whether "you believe that in entering this plea you may be gaining a tactical

advantage with regard to the penalty phase of the trial?" Counsel responded: "Yes, . . . it's for tactical reasons, yes. . . . We're doing it because we think it's the best interest [from a] tactical standpoint and because he's guilty." The prosecutor then asked if counsel was of the opinion "as an experienced attorney that based on the strength of the trial . . . your client will be convicted of the offense of [sic] which he's pleading guilty?" Counsel responded, "Yes I do." Moreover, counsel's confidence that his client would have been convicted at the guilt and special circumstance phases is well supported by the evidentiary record. Counsel apparently believed that defendant had little to gain from making the prosecutor prove his guilt, and that there was some tactical advantage in gaining sympathy for his client and taking the focus to some extent away from defendant's crime by proceeding directly to the penalty phase. Although the strategy ultimately was unsuccessful, we cannot say that it was an unreasonable decision. More importantly, nothing in the present record suggests that this strategic decision would have been altered had defendant been permitted a second attorney.

Defendant also claims that the lack of *Keenan* counsel hampered his ability to mount a penalty phase defense. Again, the record does not support his contention. Rather it shows that counsel presented an impressive defense at the penalty phase, one that included extensive evidence of defendant's physical and emotional abuse at the hands of his stepmother, testimony of a number of mental health professionals who had treated defendant, as well as the testimony of friends and family regarding defendant's redeeming qualities and remorse for the crime. Defendant does not allege otherwise except in conclusory terms.[2]

We therefore conclude that even if denial of *Keenan* counsel was error, it was not prejudicial.

### B. *Inadequate Investigative Funds*

Defendant contends there was inadequate provision of investigative funds. The facts are these. On January 17, 1996, counsel requested funds to hire Pat McGregor, an investigator specializing in penalty phase preparation. He represented that she was willing to work for $35 per hour, which was higher than the $20 per hour standard rate for investigators in Kern County at the time. The trial court, again Judge Oberholzer, reluctantly agreed to compensation at the higher rate because the case was coming to trial shortly and because there would be only one attorney on the case. The trial court ordered

---

[2] Defendant also argues that even if Judge Oberholzer did not act in excess of his jurisdiction, he abused his discretion because the case was of sufficient complexity to require cocounsel. Because, as explained below, we find no prejudice from the decision to revoke *Keenan* counsel's appointment, we need not reach this question.

a total of $7,000 in investigative funds, some of which had already been allocated to an investigator hired by the previous counsel, leaving a balance of approximately $4,375.

On April 3, 1996, when counsel submitted a bill for McGregor of $507, Judge Oberholzer apparently changed his mind, determining that there was no evidence of special expertise that would justify the higher $35-per-hour rate, and that McGregor would henceforth be compensated at $20 an hour. Counsel offered to speak with McGregor about her willingness to work at the lower rate but apparently she stopped work on the case. The next day the trial court authorized expenses for Counsel Eyherabide himself to travel to Oregon to interview witnesses. Later, Joe Serrano did some investigative work, primarily the service of subpoenas and interviews with jurors for the new trial motion discussed below, for $20 per hour for a total of approximately $1,610. The balance of the authorized investigative funds went unspent.

Defendant contends that the trial court's payment rate of $20 an hour made it impossible to hire a competent death penalty specialist. He claims that this low rate, combined with the lack of *Keenan* counsel, prejudicially hampered his counsel's ability to uncover and present mitigating evidence at the penalty phase, and that this violated his right to counsel, due process, equal protection and a reliable penalty determination.[3]

■ The right to competent counsel under the federal and state Constitutions includes the right to "reasonably necessary ancillary defense services." (*Corenevsky v. Superior Court* (1984) 36 Cal.3d 307, 319 [204 Cal.Rptr. 165, 682 P.2d 360].) Section 987.9, subdivision (a) provides among other things that upon the proper showing, funds will be provided to indigent capital defendants for "payment of investigators, experts, and others for the preparation or presentation of the defense." The trial court is to rule on the reasonableness of the request and "shall be guided by the need to provide a

---

[3] Defendant here and for a number of other claims urges that the error or misconduct he is asserting infringed various of his constitutional rights to due process and a fair trial. What we stated in *People v. Boyer* (2006) 38 Cal.4th 412, 441, footnote 17 [42 Cal.Rptr.3d 677, 133 P.3d 581], applies here: "In most instances, insofar as defendant raised the issue at all in the trial court, he failed explicitly to make some or all of the constitutional arguments he now advances. In each instance, unless otherwise indicated, it appears that either (1) the appellate claim is of a kind . . . that required no trial court action by the defendant to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply, but merely assert that the trial court's act or omission, insofar as wrong for the reasons actually presented to that court, had the additional *legal consequence* of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. [Citations.] [¶] In the latter instance, of course, rejection, on the merits, of a claim that the trial court erred on the issue actually before that court necessarily leads to rejection of the newly applied constitutional 'gloss' as well. No separate constitutional discussion is required in such cases, and we therefore provide none."

complete and full defense for the defendant." (*Ibid.*) We have held that failure to seek pretrial investigative funds pursuant to section 987.9 was one indication that counsel had failed to adequately investigate possible defenses, requiring reversal in its entirety of a capital judgment. (*In re Jones* (1996) 13 Cal.4th 552, 565 [54 Cal.Rptr.2d 52, 917 P.2d 1175].)

Even if it were true that the unreasonable denial of section 987.9 funds leading to an inadequate investigation and preparation could constitute reversible error under some circumstances, a question we do not decide, no such error is evident from the present record. There is no showing that $7,000 for conducting the investigation, paid at a $20 per hour rate, was inadequate, or that it was impossible to hire a competent specialist at that rate. In other words, defendant fails to show that the trial court acted unreasonably pursuant to section 987.9.

■ Moreover, inasmuch as defendant's claim can be understood as one for ineffective assistance of counsel, based on counsel's failure to adequately investigate available defenses because he was unable to do so, it is without merit. "To find ineffective assistance of counsel a court must determine that counsel's performance was deficient, falling ' "below an objective standard of reasonableness . . . under prevailing professional norms" ' [citations], and that there is a reasonable probability that ' "but for counsel's unprofessional errors, the result of the proceeding would have been different." ' " (*People v. Kaurish* (1990) 52 Cal.3d 648, 677 [276 Cal.Rptr. 788, 802 P.2d 278].) Here, counsel himself conducted extensive witness interviews and, as discussed above, mounted a substantial penalty phase defense. Defendant contends that additional witnesses could have been produced to testify to the abuse defendant suffered as a child. But given the quality and quantity of witnesses testifying for the defense, there is no showing on this record that the penalty phase defense mounted on defendant's behalf fell below professional norms, or that, had more witnesses been produced, it is reasonably probable a more favorable verdict would have resulted. We therefore deny this claim.

### C. *Prosecutorial Failure to Give Notice of Aggravating Evidence Pursuant to Section 190.3*

Defendant contends the prosecution failed to provide notice pursuant to the fourth paragraph of section 190.3, which provides: "Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial. Evidence may be introduced without such notice in rebuttal to evidence introduced by the defendant in mitigation." Defendant contends that

the prosecution in fact affirmatively misled defendant regarding the evidence to be presented, contrary not only to statute but to due process under the United States Constitution, and that therefore reversal is required. (See *Sheppard v. Rees* (9th Cir. 1989) 909 F.2d 1234.)

Specifically, defendant contends that the prosecution argued that defendant committed the murder with premeditation and deliberation, notwithstanding the fact that defense counsel made clear that defendant was pleading guilty to the murder on a felony-murder theory, and that the prosecution had acknowledged this felony-murder theory in the plea colloquy. Defendant was asked to plead, in count one, that he murdered Breck "willfully, unlawfully, deliberately, with premeditation and malice aforethought." During the plea colloquy, defendant's counsel stated: "I want to make one other proviso here . . . . As to count one, it does allege the language of a premeditated murder. My client is pleading guilty based on the fact that we feel a jury would convict him on the theory that he committed a felony murder. In other words, there was killing during the commission of a felony. In fact, all the special circumstances allege that it was that." The prosecutor explained that the language of the plea was the "standard language traditionally used. It does not preclude us from utilizing a felony murder theory at trial." Defense counsel then made clear that he was not requesting that the plea language be changed.

■ The People contend that defendant did not raise the inadequate notice argument below and that it is forfeited. Assuming without deciding that defendant's claim is properly preserved, we reject it on the merits. Contrary to defendant's argument, the prosecution's premeditation argument was properly introduced. Evidence about the manner in which Breck's murder occurred, which tended to show premeditation, was "evidence in proof of the offense . . . which subject[s] a defendant to the death penalty" and therefore is not subject to the notice requirements of section 190.3. Nothing in the above plea colloquy suggested that the prosecutor was consenting to refrain during the penalty phase from presenting evidence regarding the circumstances of the crime that would support a theory of premeditation or from arguing to the jury that the murder was committed with premeditation. In fact section 190.3 specifically authorizes the prosecutor to present evidence of the circumstances of the crime in aggravation. There is therefore no violation of section 190.3's notice requirement, nor is there any due process or other constitutional violation that would arise from unfair surprise to defendant or his counsel.

Defendant also claims a violation of the section 190.3 notice requirement and of his rights under the Fifth, Eighth or Fourteenth Amendments, when the prosecutor asked defendant's mother, Jennifer McNees, whether defendant became "interested in Satanism" at some point in his life. The trial court sustained counsel's objection to that question on Evidence Code section 352

grounds, i.e., that the probative value of such evidence would be outweighed by its prejudicial effect. The prosecutor did ask whether defendant at one point listened to a lot of heavy metal music, and whether defendant ever had a cross hanging upside down in his room. McNees answered affirmatively to the first question and "I don't recall" to the second. Defendant contends that the prosecution should have given notice that he intended to present evidence that defendant was involved with Satanism. Even assuming that the prosecutor's questions could be viewed as a violation of the notice requirement, and that the issue is preserved for appeal notwithstanding defendant's failure to request a continuance to prepare a response (see *People v. Williams* (1997) 16 Cal.4th 153, 241–242 [66 Cal.Rptr.2d 123, 940 P.2d 710]), no conceivable prejudice could have resulted from the above interchange. Counsel's successful, timely objection and McNees's nonresponse to the question regarding the upside-down cross meant the prosecutor was unable to present evidence of defendant's alleged interest in Satanism other than a penchant for heavy metal music.[4]

### D. *Judicial Error for Indicating During Voir Dire That the Murder Was Premeditated*

The court during voir dire indicated to some prospective jurors that defendant had committed premeditated murder. One of those prospective jurors, K.Y., served on the jury. The court told her to bear in mind "that the only time we talk about a jury making a choice between [the] death penalty and life in prison without the possibility of parole is where we have a first degree premeditated murder and one or more special circumstances have either been found true or admitted as in this case." Defendant claims judicial error, because, as discussed above, defense counsel made clear in the plea colloquy that he was pleading guilty to first degree felony murder and not murder with premeditation and deliberation. He contends this error violated his right to due process, to counsel, to an impartial jury and to a reliable verdict.

Defendant's point is well taken. The above quoted statement is incorrect as a matter of law, because those committing felony murder, without premeditation, may be eligible for the death penalty. Because defendant did not plead guilty to premeditated murder, premeditation and deliberation could not be assumed by the jury, and if used by the prosecution as an aggravating

---

[4] In his opening brief, defendant also argues that he did not receive notice of the victim impact testimony of Amy May, the victim's niece by marriage, and had he received adequate notice, he could have lodged a "proper objection" on the ground that May was not the "next of kin" authorized to make a sentencing statement pursuant to section 1191.1. Defendant concedes in his reply brief, however, that respondent is correct that such an objection would have been at odds with our holding that victim impact evidence is not limited to the testimony of blood relatives of the victim. (*People v. Brown* (2003) 31 Cal.4th 518, 573 [3 Cal.Rptr.3d 145, 73 P.3d 1137].)

circumstance, would have to be proved to the jury. Therefore, the trial court's characterization of the murder as "premeditated" had the potential of relieving the prosecutor of the obligation to prove what may have been one of the key pieces of its case in aggravation, thereby potentially violating defendant's right to due process. (See *Sandstrom v. Montana* (1979) 442 U.S. 510, 520–521 [61 L.Ed.2d 39, 99 S.Ct. 2450]; see also *People v. Sturm* (2006) 37 Cal.4th 1218, 1230–1232 [39 Cal.Rptr.3d 799, 129 P.3d 10] [trial court erred during capital case in stating that premeditation was a "gimme," when special verdict form indicated the defendant had been convicted of felony murder].)

We conclude the error was not prejudicial. The trial court's remark was followed by the prosecution's presentation of evidence of the circumstances of the crime. That evidence supported a premeditation and deliberation theory, which the prosecution argued to the jury, particularly based on the fact that defendant returned to strangle Breck a second time to make sure that she was dead. Defense counsel argued to the contrary that the evidence showed that "we weren't dealing with a real sophisticated, planned-out murder." The task of K.Y and the other jurors was ultimately not to decide whether or not defendant acted with premeditation, but rather whether the aggravating circumstances outweighed the mitigating ones such that death was the appropriate penalty. It is highly unlikely that the trial court's brief voir dire remark labeling the murder as "premeditated," would have skewed a juror's ability to weigh the evidence presented and make an unbiased penalty determination. We therefore conclude the trial court's error was harmless under any applicable standard.

### E. *Trial Court's Refusal to Allow Voir Dire on Question of Religious Affiliation*

The jury questionnaire contained a question about whether the prospective juror attended religious services regularly and about whether religious affiliation or beliefs would cause "any problem sitting in judgment in a criminal case." Defense counsel requested a question about the prospective juror's "denominational preference," which the trial court refused, remarking that "I would be the first to say . . . it is helpful to know that, but also think there are a couple of cases out there that seem to indicate that's not appropriate inquiry." Defendant contends the trial court abused its discretion in not allowing inquiry into such preference, thereby violating his rights to due process and a jury trial. We disagree.

The trial court has considerable discretion in determining the scope of voir dire. (Code Civ. Proc., § 223; see *People v. Carter* (2005) 36 Cal.4th 1215, 1250–1251 [32 Cal.Rptr.3d 838, 117 P.3d 544].) In the present case, the trial court cannot be said to have exercised its discretion, given its belief, as

quoted above, that it had no discretion to permit inquiry into denominational preference. ■ Although exclusion of a prospective juror on grounds of religious affiliation is improper (see *In re Freeman* (2006) 38 Cal.4th 630, 643 [42 Cal.Rptr.3d 850, 133 P.3d 1013]), it is not necessarily true that inquiry into such affiliation is forbidden during voir dire. Membership in a particular religious denomination or sect indicated on a jury questionnaire may alert the trial court and counsel to a potential bias in favor of or against the death penalty that requires further exploration at voir dire. (See *People v. Catlin* (2001) 26 Cal.4th 81, 118 [109 Cal.Rptr.2d 31, 26 P.3d 357] [prospective juror identified himself with a particular denomination that believes that God is the only one with the right to take someone's life].)

It does not follow, however, that a trial court's refusal to allow a denominational preference or affiliation question was either erroneous or prejudicial. In the present case, voir dire included extensive inquiry by the trial court, the prosecution, and defense counsel into prospective jurors' attitudes toward the death penalty. For example, in the case of K.Y., who was eventually seated on the jury, the trial court asked her, as it did all prospective jurors, whether she had any "conscientious opinions about the death penalty" that would cause her to vote either automatically for or against the death penalty. When she stated that she was "spiritually against the death penalty," the trial court, the prosecutor and defense counsel asked a number of followup questions to clarify her position. Given this extensive inquiry into prospective jurors' views on the death penalty, the trial court was not required to place a question on denominational preference on the jury questionnaire to be used as a preliminary indication of pro- or anti-death-penalty bias.

Defendant contends that the refusal to ask such a question was particularly damaging in the present case because, as explained more extensively below, one of the jurors, T.F., committed misconduct by reading biblical verses aloud during deliberations. Of course, the reasonableness of the trial court's decision must be considered at the time the decision was made and not with the benefit of hindsight. Moreover, defendant points to no concrete evidence indicating that such an inquiry would have led to T.F.'s exclusion from the jury. Nor does he contend that voir dire regarding T.F.'s death penalty views was inadequate. We therefore conclude that the trial court did not err in refusing a question on denominational preference.

### F. Wheeler/Batson *Challenges*

Defense counsel objected to the peremptory challenges of three jurors, two Hispanic and one Black, on the grounds that they were based on race or ethnicity, and that the jury was the product of invidious discrimination and was not representative of the community. *(Batson v. Kentucky* (1986) 476 U.S.

79, 86 [90 L.Ed.2d 69, 106 S.Ct. 1712]; *People v. Wheeler* (1978) 22 Cal.3d 258, 271–272 [148 Cal.Rptr. 890, 583 P.2d 748] (*Wheeler*).) The trial court denied these objections. Defendant now claims error.

### 1. *Factual Background*

After exercising two uncontested peremptory challenges, the prosecutor challenged R.R., a Hispanic male. Counsel made a *Wheeler* motion, citing R.R.'s questionnaire, in which he stated he thought the death penalty was imposed too seldom. The questionnaire also revealed that R.R. was employed as a machine operator for a beer distributor, had a wife employed as a substitute teacher and two young children and was "basically . . . a real mainstream down the middle fair juror." Counsel also noted that R.R. had "a couple of DUI's" but indicated that he learned his lesson. The trial court noted that R.R. on his questionnaire stated "he sometimes feels cops have attitudes because he feels they have too much power." The court then ruled that the defense had not made a prima facie showing of discrimination. The court noted that this was the "first Hispanic excused" and that the court had "observed at least one item that might be of significance to an attorney." While finding no prima facie case, the trial court invited the prosecutor to "make an observation or observations" as to why he excused R.R. The prosecution declined to do so, stating that it would be "counterproductive" in light of his understanding of the law.

After the defense exercised its sole peremptory challenge and the prosecution exercised another unanswered challenge, the defense made a *Wheeler* motion to the challenge against C.K., who was a Black male. Counsel stated that C.K. was a man who appeared to be in his 60's, was an Air Force veteran who did not have any problem with the death penalty, and had been on a prior jury which had rendered a guilty verdict. He appeared to be "an extremely neutral fair citizen." The trial court again did not find a prima facie showing. The court first observed that K.Y., a Black woman, had been seated as a juror. He further noted that the large number of C.K.'s stepchildren and relatives who had been in trouble with the law and had been in prison, was "a factor that was unique" to C.K.[5]

After exercising another uncontested peremptory challenge, the prosecution challenged F.D., a Hispanic male. Defense counsel moved for a mistrial based on the prosecution's discriminatory challenges and the "systematic exclusion of Hispanics from the jury." He stated that F.D. appeared to be in his late 50's and was a postal carrier with children and grandchildren and a great respect for law enforcement, who expressed the belief that the death penalty was

---

[5] We note that defendant is Caucasian.

imposed too seldom. The trial court this time ruled that a prima facie case had been made and directed the prosecutor to explain the reasons for the challenge. The prosecutor explained that the prospective juror's "demeanor and the manner in which he answers questions struck me as an individual who was indecisive, perhaps did not understand what he was being asked." He further stressed that on his questionnaire it stated that he did not "know if he could impose the death penalty much." The trial court denied the motion, noting that his own observations were in accord with the prosecutor's, that F.D. appeared to have trouble focusing on what was being said and coming to grips with the issues, and that there were "long pauses as he attempted to determine whether or not he could impose the death penalty."

## 2. *Legal Contentions*

Defendant contends the trial court erred in finding no prima facie case had been made with respect to R.R. and C.K. under the principles articulated in *Wheeler* and *Batson*.[6]

■ A prima facie case of discrimination in jury selection under federal law "can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.' " (*Johnson v. California* (2005) 545 U.S. 162, 169 [162 L.Ed.2d 129, 125 S.Ct. 2410], fn. omitted.) As we have explained: "[O]ur *Wheeler* decision . . . alluded to a 'reasonable inference' of group bias as a basis for a prima facie showing and also called for the defendant to establish a 'strong likelihood' that a juror has been peremptorily challenged on the basis of group bias. (*Wheeler, supra,* 22 Cal.3d at pp. 280, 281.) Our subsequent decision holding that both of the quoted terms were essentially the same as the *Batson* standard, and that a prima facie showing called for a demonstration that it was 'more likely than not' that group bias accounted for the challenge, was disapproved in *Johnson, supra,* [545 U.S. at pp. 165–167, 173] (reversing *People v. Johnson* (2003) 30 Cal.4th 1302 [1 Cal.Rptr.3d 1, 71 P.3d 270])." (*People v. Cornwell* (2005) 37 Cal.4th 50, 73 [33 Cal.Rptr.3d 1, 117 P.3d 622].) ■ In cases in which the trial court found no prima facie showing of discrimination in jury selection, and it is unclear what standard the trial court employed in making its determination, we have reviewed the record independently to discern whether a prima facie showing has been made under the proper "inference of discriminatory purpose" standard. (See *id.* at pp. 71–74; *People v. Avila* (2006) 38 Cal.4th 491, 553–554 [43 Cal.Rptr.3d 1, 133 P.3d 1076].)

---

[6] Although counsel made no independent motion or objection based on *Batson* in the trial court, his *Wheeler* motions were sufficient to preserve the *Batson* claim on appeal. (*People v. Yeoman* (2003) 31 Cal.4th 93, 117–118 [2 Cal.Rptr.3d 186, 72 P.3d 1166].)

As to Prospective Juror R.R., we conclude the trial court did not err in determining a prima facie case had not been made. Although R.R was presumably a member of a cognizable racial or ethnic group, there was nothing else to indicate group bias. At the time his removal was challenged, he was the only Hispanic prospective juror to have been considered. His expressed sentiment of skepticism toward the police and his two driving under the influence misdemeanor convictions prosecuted by the same office that was trying this case, one of which was approximately five years before the trial, serve as neutral bases for the peremptory challenge.

 It is true that defendant's challenge may be somewhat stronger when the challenge is viewed in light of the subsequent challenge to another Hispanic juror, F.D. However, as we have recently held, a trial court has no sua sponte duty to reexamine rulings on previous *Wheeler/Batson* motions once it determines that a prima facie case has been made as to one juror. (*People v. Avila, supra*, 38 Cal.4th at p. 549.) Defendant did not request that the trial court revisit R.R.'s challenge after the court had found a prima facie case of discrimination in the F.D. challenge, and we review whether the trial court's decision was correct at the time it was made and not in light of subsequent events. Moreover, even if the trial court had been asked to revisit the R.R. challenge, we find no basis for concluding that its determination would have been different. The prosecution's reasons for excusing F.D. based on his demeanor and his hesitation regarding his ability to impose the death penalty were strongly confirmed by the trial court's own independent observations, as discussed above. Therefore the challenge to F.D. would have added little to defendant's *Wheeler* motion with respect to the R.R. challenge.[7]

We also conclude that the trial court did not err in finding no prima facie case with respect to the challenge of Prospective Juror C.K. As discussed, a significant number of his stepchildren and blood relatives had been in trouble with the law and had been to prison, and he stated that "I have so many relatives that have been in and out of court . . . I would have to have four or five pages to write down . . . the different trials that they went through." At least some of them had been involved in the Kern County criminal justice system. One of his stepchildren had been prosecuted for rape by the Kern County District Attorney's Office approximately three or four years before the present trial took place, a prosecution that resulted in an acquittal. C.K. had personally been involved in helping some of his relatives through the criminal justice system. The above taken together constitutes a substantial race-neutral basis for a peremptory challenge. Moreover, he was the only

---

[7] Because the challenge to F.D. appears to have been well founded, we also reject defendant's additional contention that the prosecutor's reasons for challenging F.D. were insufficient.

prospective Black juror peremptorily challenged, and at the time of the challenge a Black woman had been seated on the jury. The subsequent seating of another Black juror reinforces our confidence that the trial court did not err in ruling that defendant had not carried his burden of making a prima facie case of discrimination.

Defendant also contends that comparative analysis of prospective minority jurors subject to peremptory challenge and seated White jurors demonstrates the prosecution's discriminatory intent. Assuming without deciding that appellate courts are obliged to undertake comparative analysis in the present case (see *Miller-El v. Dretke* (2005) 545 U.S. 231, 241 [162 L.Ed.2d 196, 125 S.Ct. 2317]; *People v. Avila, supra,* 38 Cal.4th at p. 546), we disagree that the comparative analysis that defendant presents in this court assists his case. Defendant points to three jurors who had some supposedly comparable experience with law enforcement or involvement in the criminal justice system. Prospective Juror L.J. had a son who had been convicted of a marijuana-related misdemeanor. L.J. did not have nearly as extensive a family involvement in the criminal justice system as did C.K., and did not express a negative attitude toward law enforcement officers as did R.R. Another juror, E.G., had had a daughter-in-law whose brother was convicted of murder but, unlike C.K., the juror did not appear to have any connection to the case or attend court proceedings.

A closer question is presented by Juror S.M. S.M.'s husband was a witness in the highly publicized murder trial of Patrick Dunn, which was the subject of a book, Mean Justice (1999), by Edward Humes that was highly critical of the prosecutor in this case, District Attorney Ed Jagels, and the criminal justice system in Kern County. S.M. stated she felt that "there were some things that weren't properly brought out" by the prosecution, which would have led to more a favorable result for Dunn. Therefore S.M., unlike C.K., came away from her experience with the Kern County criminal justice system with a belief that the prosecution, and in all likelihood the prosecutor in the present case, had been unfair to a defendant, and in particular a murder defendant. S.M. did profess that this experience would not affect her ability to be a fair juror on a murder trial, but so did C.K. Unlike R.R., she had not been recently prosecuted by the Kern County District Attorney, but neither had C.K. On the other hand, S.M.'s husband was a witness in a Kern County trial, whereas some members of C.K.'s family had been defendants.

Although it is difficult to explain on the cold record and without the benefit of having heard the prosecutor's reasons for the peremptory challenge of C.K., why S.M. was seated and C.K. was not, we do not believe this difficulty should be a basis for concluding there was prima facie case that a *Wheeler/Batson* violation had been committed. Our confidence in the results

of appellate comparative analysis is somewhat diminished when there is a "lone questionable peremptory challenge" and the record reveals "a sound, objectively plausible basis" for the challenge. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1254 [56 Cal.Rptr.2d 49, 920 P.2d 1254] (conc. opn. of Mosk, J.).) Moreover, C.K. was the only Black juror to be peremptorily challenged. (Cf. *Miller-El v. Dretke, supra*, 545 U.S. at p. 241 [125 S.Ct. at p. 2325] [10 Black prospective jurors struck and one on panel].) Although, to be sure, a *Wheeler/Batson* violation may occur with a single discriminatory challenge, when as here there is a legitimate basis for dismissing the prospective juror and no pattern of discrimination appears as to Black jurors, a court should be hesitant to infer a *Wheeler/Batson* violation when comparative analysis raises questions as to a single prospective juror, particularly "given the legitimate role that subjective factors may have in a prosecutor's decision" to challenge or not challenge jurors peremptorily. (*Jackson, supra*, at p. 1254 (conc. opn. of Mosk, J.).) We therefore conclude that there was no prima facie case that a *Wheeler/Batson* violation was committed in excluding C.K.

### G. *Erroneous Admission of Aggravating Evidence*

Defendant claims that several pieces of aggravating evidence were erroneously introduced at the penalty phase, in violation of his rights under the Eighth and Fourteenth Amendments of the United States Constitution. We will consider each of these in turn.[8]

### 1. *Admission of the Anonymous Phone Calls*

First, defendant claims there was insufficient foundation to hold him responsible for several late-night phone calls made the night before the murder to the Breck residence, in which the caller hung up immediately after the phone was answered. He claims that these phone calls tended to buttress the prosecutor's contention that defendant planned and premeditated the murders.

Evidence Code section 403 states in pertinent part: "(a) The proponent of the proffered evidence has the burden of producing evidence as to the existence of the preliminary fact, and the proffered evidence is inadmissible unless the court finds that there is evidence sufficient to sustain a finding of the existence of the preliminary fact, when: [¶] . . . [¶] (4) The proffered

---

[8] In his opening brief, defendant contended that it was error to admit the victim impact testimony of Amy May, the victim's niece by marriage, because she was not a blood relative. Defendant acknowledges in his reply brief that we have already rejected this limitation on victim impact testimony. (*People v. Brown, supra*, 31 Cal.4th 518, 573.) Defendant asks us to reconsider our holding in *Brown*, but provides no persuasive reason for doing so.

evidence is of a statement or other conduct of a particular person and the preliminary fact is whether that person made the statement or so conducted himself." Here, the trial court did not err in admitting the evidence. The day before the phone calls, defendant had stolen Breck's wallet, and although not clear from the record, the wallet may have contained a card or document with Breck's unlisted number. Defendant burglarized Breck's home and raped and murdered her the following day. The jury may reasonably have inferred that defendant made those calls. Moreover, evidence of the calls touched only tangentially on the question of defendant's mental state at the time of the crimes, and therefore their admission, if error, would have been harmless by any applicable standard.

## 2. Admission of Location of Johnson and Glass Burglaries

The prosecution sought to admit under section 190.3, factor (b) evidence of three burglaries that had occurred shortly before the murders, as showing "[t]he presence . . . of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." The trial court initially excluded evidence of the circumstances of two of these crimes, the burglaries at the Johnson and Glass residences, although it allowed the fact of his conviction for these burglaries to be admitted under section 190.3, factor (c). At the close of the trial, just prior to instructing the jury, however, the trial court ruled that evidence of defendant's convictions for these burglaries was not admissible under factor (c), because convictions are only admissible under this section if they predate the murder or murders with which a defendant is charged. (*People v. Scott* (1997) 15 Cal.4th 1188, 1223 [65 Cal.Rptr.2d 240, 939 P.2d 354].) Because the convictions for these burglaries were contemporaneous with defendant's murder conviction, they were therefore not admissible as prior felony convictions. The trial court also ruled, however, that evidence of the Johnson and Glass burglaries was still properly admitted under section 190.3, factor (a), the circumstances of the crime, because they tended to show defendant's state of mind as someone in trouble with the law seeking to find the means to get away, at the time the murder was committed.

Notwithstanding the initial limitations on the presentation of the evidence regarding the Johnson and Glass burglaries, the prosecutor, during the opening statement, showed the jury a map of where the various burglaries occurred and divulged the locations of the Johnson and Glass burglaries. Counsel eventually objected and the trial court sustained the objection, not allowing the prosecutor to complete this part of his presentation. Defendant contends disclosure of the location of these burglaries was prejudicial error, resulting in violations of his right to due process, to counsel, and to an impartial jury.

The trial court's exclusion of the circumstances of the Johnson and Glass burglaries was based on the erroneous belief that such burglaries were only admissible to the extent allowed under section 190.3, factor (c), rather than factor (a). It is unclear what limitations if any would have been placed on the admission of such evidence if it had been admitted under factor (a). But even assuming error, no prejudice resulted. Defendant contends that the fact these burglaries, together with the Elliott burglary, which was admitted into evidence, and the Breck burglary and murder, were in the same location supported the prosecution's premeditation theory. In fact the evidence of the location of the burglaries was at best only incidentally connected to the prosecution's theory of defendant's mental state. We conclude that divulging the location of these burglaries was harmless under any applicable standard.

### 3. *Admission of Circumstances of the Elliott Burglary*

Defendant contends that evidence of the Elliott burglary was erroneously admitted under section 190.3, factor (b). After defense counsel objected before trial to the admission of evidence of that burglary, the prosecution made an offer of proof, indicating that defendant used a knife to gain access to the house, that he stole a number of guns from the Elliott residence, and that the Elliotts' adult daughter returned to the house apparently while defendant was inside, although there was no direct contact between them. The trial court concluded that the evidence should be admitted, stating that there was "a fair inference that there is an implied threat to use force or violence."

At trial, the Elliotts' daughter, Brandie Barnden, testified that she returned to the Elliott house around 10:45 a.m. after having been at school, and noticed that there were several matchbooks on the floor, that the garage door was not locked, and that the door from the garage to the backyard was open. When she entered her parents' bedroom to listen to messages on the answering machine, something caught her eye like the movement of a shoe, but she believed her mind was playing tricks on her. When she telephoned her mother shortly thereafter, she thought someone else was on the line, which caused her to leave the house and call the police. Barnden's father, Joe Elliott, subsequently reported several missing guns and his fishing tackle. Most of the guns were recovered in a duffel bag approximately 150 yards from the Elliott house, but a .38-caliber-special handgun was found on defendant.

Defense counsel move to strike evidence concerning the Elliott burglary, contending that it did not meet the criteria of section 190.3 for violent criminal activity and that this case was distinguishable from one in which we had admitted burglary evidence, *People v. Clair* (1992) 2 Cal.4th 629, 672–678 [7 Cal.Rptr.2d 564, 828 P.2d 705] (*Clair*). The trial court denied the motion,

stating that the fact that there was a "potential confrontation with a[n] armed burglar" made the situation "fraught with the potential for violence." Defendant claims the trial court erred.

In *Clair*, the evidence showed that the defendant broke into a woman's then unoccupied apartment, that he was captured lying in the woman's bed in his underwear, and had brought a butcher knife with him, which was found in the bathroom. (*Clair, supra*, 2 Cal.4th at pp. 673–674.) We affirmed the trial court's holding that the evidence was appropriately admitted under section 190.3 as criminal activity employing force or violence. "There was an implied threat. The reasonable inferences are these. Aware of the presence of those who came to the apartment in response to his arrival, defendant took up the knife in the kitchen against their imminent entry. He did so in order to avoid apprehension and make good his escape. Certainly, his purpose was *not* to employ the weapon simply to facilitate the taking of property: he evidently came equipped with a screwdriver to that end. Not only did he take up the knife, but he also carried it around the apartment as he seemingly readied himself for action. Apparently deciding at the last moment not to risk a physical confrontation but to try to lie himself out of trouble, he cast the weapon away before he actually put it to use. Thus, he chose not to follow through. But he did not, and could not, undo what he had already done. He made an implied threat to use the knife against anyone who might interfere." (*Clair, supra*, 2 Cal.4th at pp. 676–677.)

Defendant argues that in this case, unlike in *Clair*, there was no evidence defendant was readying himself to commit violence and then abandoned the plan. Whether or not the trial court erred in admitting evidence of the Elliott burglary, we conclude that the error was not prejudicial. The facts of the burglary were not particularly gruesome. Indeed, the very characteristics of the burglary that make the question of its admissibility close, i.e., that defendant did not enter the house with intent to commit violence, and that no violence resulted, undermine the notion that the jury would have been swayed toward a death sentence by knowledge of the facts of the burglary. In light of the other aggravating evidence against defendant—the circumstances of the crime emphasized by the prosecutor, as well as the properly admitted evidence about the burglary convictions—we conclude that the admission of the facts about this arguably nonviolent burglary was harmless by any applicable standard.

### 4. *Admission of Evidence of Premeditation and Sodomy*

Defendant claims evidence that the murder was premeditated and that he sodomized Breck should not have been admitted, because he did not plead to either premeditated murder or to sodomy. As discussed above, section 190.3

explicitly permits evidence regarding the circumstances of the crime, including the circumstance that the murder may have been premeditated, during the penalty phase, and nothing in the plea agreement precluded such admission. So, too, nothing in the plea agreement prevented admission of evidence that defendant sodomized Breck, as Detective Legg testified defendant had admitted shortly after his arrest.

### H. *Exclusion of Tape Recording and Video Recording Showing Remorse*

Defendant made a statement to Detective Legg about five hours after he was arrested. He confessed to the murder, and claimed he did not know what had happened and "went crazy all of a sudden." He also apparently cried during the confession. The confession was tape-recorded. Defendant made a second confession shortly thereafter at the police station, which was not tape-recorded or transcribed, in which he claimed to have "blacked out," regaining consciousness only after the murder. Defendant gave a third interview approximately 24 hours later, in which he confessed to the crime in detail, abandoning any suggestion that he "blacked out." The prosecutor sought to admit the tape and transcripts of this third interview into evidence, but sought to exclude the tape and transcript of the first interview, which he opposed because it was exculpatory hearsay. The trial court agreed, over defense counsel's objection. Counsel sought to admit the tape to make clear to the jury that defendant experienced remorse shortly after he had committed the crime. Defendant now claims the trial court erred in excluding the recording of the first interview and that this error violated his rights to due process, a fair sentencing hearing, and a reliable penalty phase determination as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

 "A trial court's decision to admit or exclude evidence is reviewable for abuse of discretion." (*People v. Vieira* (2005) 35 Cal.4th 264, 292 [25 Cal.Rptr.3d 337, 106 P.3d 990].) "[A] defendant's due process rights are violated when hearsay testimony at the penalty phase of a capital trial is excluded, if both of the following conditions are present: (1) the excluded testimony is 'highly relevant to a critical issue in the punishment phase of the trial,' and (2) there are substantial reasons to assume the reliability of the evidence." (*People v. Kaurish, supra,* 52 Cal.3d at p. 704, quoting *Green v. Georgia* (1979) 442 U.S. 95, 97 [60 L.Ed.2d 738, 99 S.Ct. 2150].)

Defendant argues that his crying during the first interview was not hearsay and should therefore have been admitted. We considered a similar situation recently in *People v. Jurado* (2006) 38 Cal.4th 72 [41 Cal.Rptr.3d 319, 131 P.3d 400], in which the defendant claimed that his sobbing and other

emotional conduct depicted on a videotaped interrogation with the police was admissible nonhearsay. As we stated: "Defendant is correct that, *by themselves*, defendant's emotional displays were nonassertive conduct, and thus not within the hearsay rule. . . . [¶] But the defense sought to introduce more than just evidence of the emotional displays themselves. To explain the significance of the emotional displays, and particularly defendant's statement that as a result of the murder he had received an 'injury from [his] conscience,' the defense sought to introduce the statements defendant made during the videotaped interview. As defendant must concede, those statements, including assertions and descriptions of his own feelings and other mental states, were hearsay. . . . As the trial court correctly determined, the circumstance that defendant made his statements during a postarrest police interrogation, when he had a compelling motive to minimize his culpability for the murder and to play on the sympathies of his interrogators, indicated a lack of trustworthiness. In past decisions, we have upheld the exclusion of self-serving postcrime statements made under similar circumstances." (*People v. Jurado, supra,* 38 Cal.4th at pp. 129–130.)

In the present case, as in *Jurado,* defendant's nonassertive conduct was intertwined with statements he made designed to minimize his culpability, e.g., that he went "crazy all of a sudden," thereby tending to disavow that he committed the murder with premeditation. We conclude that the trial court did not abuse its discretion in excluding the taped interview containing such self-serving statements.

 Defendant contends that the tape recording should have been admitted as a spontaneous utterance. Although defendant did not explicitly seek to admit the evidence on those grounds at trial, he argued when pressing his *Green v. Georgia* claim that in effect the statement was particularly reliable because it was spontaneous. The trial court did not abuse its discretion in implicitly rejecting that contention. "Evidence Code section 1240 provides, in pertinent part, that evidence is 'not made inadmissible by the hearsay rule' if it '[p]urports to narrate, describe, or explain an act, condition, or event perceived by the declarant' (*id.,* subd. (a)), and it was 'made spontaneously while the declarant was under the stress of excitement caused by such perception.' (*Id.,* subd. (b).) 'The crucial element in determining whether a declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is . . . not the nature of the statement but the mental state of the speaker. The nature of the utterance—how long it was made after the startling incident and whether the speaker blurted it out, for example—may be important, but solely as an indicator of the mental state of the declarant. . . . [U]ltimately each fact pattern must be considered on its own merits, and the trial court is vested with reasonable discretion in the matter.' " (*People v. Roybal* (1998) 19 Cal.4th 481, 516 [79 Cal.Rptr.2d 487, 966 P.2d 521].) Here, the trial court did not abuse its discretion in concluding that defendant's

somewhat self-serving statements made several hours after the murder did not qualify as a spontaneous utterance.

 Defendant also claims the tape recording should have been admitted under Evidence Code section 356, contending that because the court admitted the third interview, it was obliged to also admit the first interview, a contention the trial court rejected. Section 356 provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence." "The purpose of this section is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed. [Citation.] Thus, if a party's oral admissions have been introduced in evidence, he may show other portions of the same interview or conversation, even if they are self-serving, which 'have some bearing upon, or connection with, the admission . . . in evidence.' " (*People v. Arias* (1996) 13 Cal.4th 92, 156 [51 Cal.Rptr.2d 770, 913 P.2d 980].) In the present case, the trial court did not abuse its discretion in concluding that admission of the third interview did not require admission of a *different* interview, and that no misleading impression was created by admitting one without the other.

Finally, defendant claimed the trial court erred in failing to admit a videotape of his interview with a television reporter some 72 hours after his arrest, in which he expressed remorse for the crime and extended condolences to the victim's family. The trial court did not abuse its discretion in concluding that the videotape did not pass muster under *Green v. Georgia*, inasmuch as there is no substantial reason for believing that defendant's postarrest statement to the media was particularly reliable.

### I. *Improper Exclusion of Mitigating Evidence*

Defendant argues that various pieces of mitigating evidence were wrongly excluded in violation of his United States Constitution Fifth, Sixth, Eighth, and Fourteenth Amendments rights. Each of these claims will be considered in turn.

#### 1. *Evidence of Mistreatment by Defendant's Father*

On direct examination Jennifer McNees, defendant's mother, when asked why she and her then husband Bob Williams, Sr., had moved out of his parents' house soon after their marriage, replied that it was "not a good

situation." When asked to elaborate, the prosecution objected. In chambers, counsel responded that he intended to ask about fights between McNees and Bob Williams, Sr., when defendant was very young, and in particular about an incident in which Williams, Sr., punched McNees in the stomach while she was pregnant with defendant. The prosecutor objected that incidents that did not occur in defendant's presence or occurred when he was so young that he would not have a memory of them should be excluded. The court ruled that testimony regarding the punching incident would be excluded unless the defense was prepared to offer some foundational medical testimony that defendant was injured as a result. The trial court also ruled, however, that testimony of violence that occurred in defendant's presence even at a young age would be admissible. Defendant contends the trial court erred in not allowing evidence that defendant's father punched his mother when she was pregnant with defendant.

■ The Eighth Amendment to the United States Constitution requires that a capital jury not be precluded from "considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (*Lockett v. Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 98 S.Ct. 2954], fn. & italics omitted.) Nonetheless, the trial court still " 'determines relevancy in the first instance and retains discretion to exclude evidence whose probative value is substantially outweighed by the probability that its admission will create substantial danger of confusing the issues or misleading the jury.' " (*People v. Cain* (1995) 10 Cal.4th 1, 64 [40 Cal.Rptr.2d 481, 892 P.2d 1224].) Defendant argues on appeal that the punching incident would have shown that defendant was an unwanted child, and the father, as well as the stepmother, neglected and abused defendant. Defense counsel did not advance that theory of admissibility at trial, nor is the act of violence toward the pregnant mother particularly probative of the father's subsequent conduct toward the child after he was born. Moreover, there was considerable evidence that defendant's father did not have a good relationship with defendant. We conclude that the trial court did not abuse its discretion in excluding this testimony, and, even if it had, the error would have been harmless under any applicable standard.[9]

## 2. *Evidence of Accommodation of Sexual Abuse*

Evidence was presented that defendant may have been sexually abused, as well as physically and emotionally abused, by his stepmother. Some of the

---

[9] Defendant also contends conclusorily that the trial court erred in upholding the prosecution's objection to a question asked of social worker Joan Nelson about defendant's father's reaction to the news that defendant was to be moved to California to live with his mother. The exclusion of evidence of such a tangential matter was not error.

testimony came from Vahid Sadeghi, a marriage, family and child therapist who had worked with and examined defendant at age 16 when the latter was in a group home for adolescents on probation for minor crimes. He testified that defendant had told him that his stepmother asked him to take off his clothes and lay in bed before she hit him, which raised a "red flag" for Sadeghi that sexual abuse may have occurred. Defendant denied to Sadeghi that such abuse had occurred. Sadeghi testified that some children do not reveal to him that they have been molested, but when asked if he believed defendant's denial, the prosecution objected to the question as calling for speculation, which the trial court sustained. Later, forensic psychologist Eugene Couture testified that according to various studies, only 2 percent of sexual abuse within families is reported.

Defendant claims the trial court committed error in sustaining the objection to the defense counsel's question. We disagree. Contrary to defendant's assertion, the exclusion of Sadeghi's answer to the above question did not undermine defendant's ability to make the case that he had been the victim of sexual abuse notwithstanding his earlier denials. The trial court acted within its discretion in disallowing a question that required the witness to speculate about the truth of defendant's denial of sexual abuse, while allowing evidence that such denial is common, permitting defendant to adequately make his case that the denial was untrue.

### 3. *Other Evidence*

Defendant contends the trial court erred in excluding testimony by defendant's girlfriend, Tina Meagher, that defendant had told her to move on with her life and to marry someone who would adopt their child. The trial court ruled such testimony was inadmissible hearsay. Defendant argues on appeal that the evidence should have been admitted following *Green v. Georgia*, *supra*, 442 U.S. 95. As discussed above, under *Green* hearsay may be admitted at the penalty phase of a capital trial if it is "highly relevant to a critical issue in the punishment phase of the trial," and "substantial reasons existed to assume its reliability." (*Id.* at p. 97.) Defendant does not explain why either *Green* factor applies. Moreover, nothing prevented defendant from retaking the stand to testify about this statement. The claim therefore fails.

Defendant also claims error at the exclusion of a letter he had written his mother as a child, which purported to show that defendant's mother did not want to visit her son. There was abundant evidence in the record that defendant's mother neglected and did not visit him. The exclusion of the letter, even if error, was not prejudicial under any applicable standard.

The trial court also excluded a letter written by Irma Williams, defendant's grandmother, when defendant was around 16 years old, which stated that he

could come live with her. Defendant argues the letter was relevant for showing that his placement with his mother was inadequate and his grand-mother was offering him a better alternative that he was never able to take advantage of. The trial court concluded that the letter was not relevant to any issue in the case, that it was written long after that placement, and that Irma Williams had already testified to the substance of what was in the letter and had even read portions of the letter into the record. We conclude the trial court did not abuse its discretion in excluding the letter.

### J. *Prosecutorial Conduct During Defendant's Testimony Regarding Sexual Abuse*

On direct examination, defendant was asked if his stepmother had sexually molested him and he replied that she had. At that point, apparently, the prosecutor reacted in some visible and audible way to defendant's answer. Defense counsel asked for a hearing outside the presence of the jury. The trial court did not grant the request, but directed the prosecutor "not to make any other noises at his table."

At the next opportunity outside the presence of the jury, defense counsel moved for a mistrial based on the prosecutor's previous conduct. He stated: "I couldn't actually see what counsel did but it had the sound as if he had just dropped a binder or kind of flipped a notepad. But kind of like in disgust he threw something and it was very audible to me . . . . I think he was trying to send a message to the jury that he personally thinks that [defendant's testimony was] untrue. And that's the only message I think that you could get from that reaction." Counsel also argued that the prosecutor, Edward Jagels, the Kern County District Attorney had "a lot of stature in this community" and "when he does something like that, I think it has a lot of influence over jurors."

The prosecutor stated that he had dropped a yellow pad he was holding on a binder, that the sound made was quite soft, and that he did so out of surprise because he had had no previous information about defendant's claims of molestation.

The court denied the motion for the mistrial, stating: "What I observed was essentially what [defense counsel] has described, that counsel slammed down something, [it] wasn't super loud, and rolled his eyes. And Mr. Jagels, you know that's inappropriate in front of the jury. I don't want it to happen again." Defendant contends that the denial of this motion was in error, and violated his Eighth and Fourteenth Amendment rights to a fair penalty trial and reliable penalty determination.

 As the trial court's comments indicate, the prosecutor's behavior was inappropriate. (See *People v. Hill* (1998) 17 Cal.4th 800, 834 [72

Cal.Rptr.2d 656, 952 P.2d 673] [prosecutor audibly laughing in the middle of defense counsel's examination of various witnesses is misconduct].) But such conduct does not necessarily require a declaration of a mistrial. "Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (*People v. Haskett* (1982) 30 Cal.3d 841, 854 [180 Cal.Rptr. 640, 640 P.2d 776].) "A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged, and we use the deferential abuse of discretion standard to review a trial court ruling denying a mistrial." (*People v. Bolden* (2002) 29 Cal.4th 515, 555 [127 Cal.Rptr.2d 802, 58 P.3d 931].)

We conclude the trial court did not abuse its discretion in denying the motion for a mistrial. The trial court was in the best position to gauge the exact nature of the prosecutor's conduct and its likely effect on the jury. Nothing in the record undermines the trial court's implicit conclusion that the prosecutor's brief episode of inappropriate conduct did not irreparably damage defendant's chance of receiving a fair trial.

### K. *Prosecutorial Misconduct in Presenting Time and Place of Previous Burglaries*

As discussed in part 7, we reject defendant's contention that there was prejudicial error in disclosing the location of the Johnson and Glass burglaries. Defendant also claims prosecutorial misconduct in such disclosure, in violation of his rights under the Eighth and Fourteenth Amendments. We reject that claim as well. As explained above, the exclusion of the location of the burglaries was based on the trial court's initially erroneous belief that such burglaries were only admissible as prior convictions under section 190.3, factor (c), rather than under factor (a). In any case the mention of these locational facts to the jury was not prejudicial under any applicable standard. We come to the same conclusion with regard to the prosecutor's statement that defendant took long walks to "case" the houses in which the burglaries took place.

### L. *Other Prosecutorial Misconduct Claims*

Defendant makes three other prosecutorial misconduct claims, which we consider in turn.

#### 1. *Questions About Satanism*

As recounted above in part 3, the prosecution asked defendant's mother Jennifer McNees if defendant became "interested in Satanism" at some point

in his life. The trial court sustained counsel's objection to that question on Evidence Code section 352 grounds, i.e., that the probative value of such evidence would be outweighed by its prejudicial effect. The prosecutor did ask whether defendant at one point listened to a lot of heavy metal music, and whether defendant ever had a cross hanging upside down in his room. McNees answered affirmatively to the first question and "I don't recall" to the second. Defendant claims misconduct, contending that the prosecution asked about defendant's association with Satanism without any good faith belief that such evidence existed in order to plant a seed in the jury's mind that there was such association. The record does not indicate bad faith on the prosecutor's part. Rather, a probation report revealed defendant's interest in heavy metal music and that he at one point had an upside-down cross in his room. Furthermore, McNees refused to speak to the prosecution. The prosecution legitimately sought to counter defense evidence that painted defendant in a sympathetic light with questions designed to probe the probation report material. Although the trial court sustained the objection to the prosecution's question regarding Satanism, the question itself did not rise to the level of misconduct, nor did the followup questions regarding the upside-down cross or heavy metal music.

### 2. *Gang Involvement*

The prosecutor also asked McNees: "During the time that Bob lived with you, did you notice any conduct on his part having to do with gangs?" She answered, "No, sir." Defendant again claims the prosecution asked the question in bad faith to tarnish the jury's view of defendant. Nothing in the record indicates that the prosecution, who had had no previous access to McNees, was asking the question in bad faith. Nor can be it said that the question itself, followed by the negative response, was prejudicial to defendant's case.

### 3. *Questioning Regarding Premeditation*

The prosecution asked defendant during cross-examination whether he had initially lied to the police about the Breck burglary that had occurred the day before the murder because the burglary would have made the murder seem more premeditated. Defendant replied in the negative and stated only that he did not want to admit the burglary to the police. Defendant now contends that the prosecution committed misconduct by questioning him about premeditation, because he had pleaded guilty only to first degree felony murder and not premeditated murder. As explained above in part 3, nothing in the plea agreement restricted the prosecution's ability to present evidence of the circumstances of the crime, including evidence of premeditation. There was no misconduct.

### M. *Jury Instructions About Premeditation and Impaired Capacity*

Defendant claims the trial court should have instructed the jury sua sponte on the issue of premeditation and deliberation, because whether or not defendant committed premeditated murder, or nonpremeditated felony murder as he professed in his plea, was a critical issue at the penalty phase. He contends this failure to instruct violated his due process rights under the Fourteenth Amendment.

 The trial court is required to instruct on general principles of law relevant to the case. (*People v. Breverman* (1998) 19 Cal.4th 142, 154 [7 Cal.Rptr.2d 870, 960 P.2d 1094].) In the present case, the jury was not required to make a determination on premeditation and deliberation. Indeed, a capital jury during the penalty phase is neither statutorily authorized nor constitutionally required to make any findings regarding the factors in aggravation and mitigation. (See *People v. Vieira, supra,* 35 Cal.4th at p. 303.) Instead, it is required only to weigh aggravating and mitigating evidence, including the circumstances of the crime, in order to arrive at a penalty determination. There is no reason why the jury should have had to view evidence about how the murder took place through the filter of a legal definition of premeditation and deliberation in order to make its penalty determination. The lack of a premeditation instruction was not error.

 Defendant also claims the trial court should have elaborated on section 190.3, factor (h), which states that the jury must consider "[w]hether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the affects of intoxication." Defendant argues that the trial court should have given an instruction, sua sponte, that would have made clear that the impairment referred to in the above instruction specifically could impair the defendant's ability to deliberate. Again, because the jury was not required to find whether or not defendant had deliberated, such an instruction focusing on deliberation was not required or, in fact, appropriate.

Defense counsel at trial also requested an instruction elaborating on section 190.3, factor (h), and defendant on appeal contends it was error not to deliver at least part of that instruction. The portion of the requested instruction that defendant contends should have been delivered stated: "Mental or emotional disturbance may result [from] any cause or may exist without apparent cause. For this mitigating circumstance to exist, it is sufficient that . . . the defendant's mind or emotions were disturbed, that is, interrupted or interfered with, [from] any cause whether [from] consumption of drugs, mental illness, or other cause, and that he was under the influence of that disturbance when

he killed Ms. Breck. A person would be under the influence of a mental or emotional disturbance if a mental or emotional condition existed which included [sic] his conduct so as to make it different than it otherwise would have been. [¶] So if you are satisfied from the evidence that at the time of the murder of Ms. Breck, the defendant was under the influence of [a] mental or emotional disturbance, from any cause, it would be your duty to find this as a mitigating circumstance."

We find nothing in the above rather confusing instruction that would have clarified the instruction already given pursuant to section 190.3, factor (h). The trial court did not err in refusing such instruction.

Defendant also claims the trial court erred in failing to instruct sua sponte according to CALJIC No. 2.02 regarding the use of circumstantial evidence to prove whether or not defendant possessed a particular mental state. That instruction is intended for a jury that is required to find a mental state as an element of a crime. (See *People v. Cole* (2004) 33 Cal.4th 1158, 1222 [7 Cal.Rptr.3d 532, 95 P.3d 811].) As explained above, the jury was not required to find at the penalty phase that defendant possessed a particular mental state during the murder, such as premeditation and deliberation. The trial court did not err in failing to give this instruction.

### N. Failure to Give Reasonable Doubt Instruction with Respect to Sodomy Evidence

As discussed, defendant did not plead guilty to the sodomy special circumstance; although he initially told Detective Legg he had sodomized Breck, he recanted that confession. During the penalty phase, the prosecutor introduced evidence of defendant's confession of sodomy and argued to the jury that defendant had in fact sodomized Breck. The trial court instructed the jury with a modified CALJIC No. 2.01 instruction that before the jury could consider the Elliott burglary "to be a criminal act involving an implied threat of force or violence, it must determine the defendant armed himself and was in the house at the same time as Mrs. Barnden. This proof must be beyond a reasonable doubt . . . ." The trial court then instructed the jury on the definition of reasonable doubt "with reference to the instruction just read." Defendant now claims that the reasonable doubt instruction should have also referred to defendant's alleged crime of sodomy, in other words, that the jury should have been instructed that it could only consider the alleged sodomy against defendant if it concluded beyond a reasonable doubt that such act occurred. He contends that this instructional error violated his rights under the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.

 Generally speaking, neither California law nor the United States Constitution requires that aggravating factors be proven beyond a reasonable doubt. (*People v. Box* (2000) 23 Cal.4th 1153, 1217 [99 Cal.Rptr.2d 69, 5 P.3d 130].) The one exception is unadjudicated criminal acts involving force or violence under section 190.3, factor (b), which requires that jurors be instructed that they can consider such acts in aggravation only if they find beyond a reasonable doubt that defendant had committed the acts. (*People v. Monterroso* (2004) 34 Cal.4th 743, 793 [22 Cal.Rptr.3d 1, 101 P.3d 956].)

Defendant claims that the sodomy evidence was being introduced as an unadjudicated criminal act under section 190.3, factor (b) and that therefore a reasonable doubt instruction was required. The record does not support his contention. The trial court instructed the jury that "evidence has been introduced that may show that the defendant engaged in criminal activity other than the instant offense and the Elliott burglary. You may not consider such evidence as a factor in aggravation. You may consider the Elliott burglary in deciding whether the defendant has engaged in criminal activity which involves the use of, or the express or implied threat of force or violence, if you conclude the defendant armed himself and was in the house at the time Ms. Barnden was present." Thus, the trial court made clear that the Elliott burglary was the only incident to be considered under factor (b), and that they could not consider sodomy as independent criminal activity but only as a circumstance of the murder of which defendant was being tried.

Defendant asserts that the trial court's instruction defining the term "sodomy" indicated that sodomy was to be considered as a criminal act under section 190.3, factor (b). The trial court stated: "Various types of crimes have been mentioned in this case, ladies and gentlemen, and I won't define them for you except for one. It has been my experience that sometimes people do not understand the meaning of the word sodomy and I will define that for you from a legal perspective. Sodomy is sexual conduct consisting of contact between the penis of one person and the anus of another person. Any sexual penetration, however slight, is sufficient to complete the act of sodomy. Proof of ejaculation is not required."

Sodomy per se is not a crime and the trial court did not define the crime of sodomy, which is the commission of sodomy under specified circumstances, such as by means of force, or with minors. (§ 286.) Rather, the trial court defined the word "sodomy" because of the jury's possible unfamiliarity with it. Read in conjunction with the instruction in the previous paragraph, in which the trial court made clear that the Elliott burglary was the only crime other than the current offense to be considered in aggravation, the jury would not have understood the trial court's definition of sodomy to imply that sodomy could be considered under section 190.3, factor (b). Moreover, the

prosecutor said nothing during closing argument to suggest that evidence of sodomy would be considered as unadjudicated criminal activity, and spoke of such evidence solely within the context of elaborating upon the circumstances of the crime. We therefore conclude that the failure to instruct on reasonable doubt in reference to defendant's alleged sodomy of Breck was not error.

### O. *Failure to Instruct on Mitigating Factors*

The jury was instructed under a modified version of section 190.3, factor (k) to consider "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that the defendant proffers as a basis" for mitigation. (See *People v. Easley* (1983) 34 Cal.3d 858, 879, fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813].) Defendant contends the trial court improperly refused requested jury instructions that would have specified the sort of evidence that can be considered in mitigation under factor (k). As defense counsel acknowledges, this court has rejected the argument that the Constitution requires additional jury instructions elaborating on modified factor (k). (See *People v. Catlin*, *supra*, 26 Cal.4th at pp. 173–174, and cases cited therein.) Defendant advances no persuasive argument for reconsidering this position.

### P. *Responses to Jury Questions on Life Sentence*

The jury was instructed: "It is the law of this state that the penalty for a defendant found guilty of murder of the first degree shall be death or confinement in the state prison for life without the possibility of parole in any case in which the special circumstances alleged in this case have been found or admitted to be true." During deliberations, the jury asked the following questions: "Is it possible for the court to provide the jury with a clear definition of the law of life in prison without the possibility of parole. A. Does 'life' have time application [*sic*]; B. Does [*sic*] any of the verdicts automatically go to appeals? C. Will the individual have the right to go before a parole board even though they have no possibility of parole?"

The trial court discussed these questions with counsel outside the presence of the jury, and defense counsel suggested that an instruction be given that defendant "will never come before a parole board." The trial court eventually gave the jury the following response: "The instruction I'm going to read you and will send back with you is this, which I think covers all three subparts of your question: In making your decision in this case, as to the appropriate penalty, you are to assume that if you select death that sentence will be carried out. If you select life without possibility of parole, you are to assume that the defendant will never be released from prison."

Defendant claims judicial error from the trial court's response, in violation of his Eighth and Fourteenth Amendment rights. His claims are based on *Simmons v. South Carolina* (1994) 512 U.S. 154 [129 L.Ed.2d 133, 114 S.Ct. 2187] and its progeny. In these cases, the court has held that "where a capital defendant's future dangerousness is at issue, and the only sentencing alternative to death available to the jury is life imprisonment without possibility of parole, due process entitles the defendant 'to inform the jury of [his] parole ineligibility, either by a jury instruction or in arguments by counsel.' " (*Shafer v. South Carolina* (2001) 532 U.S. 36, 39 [149 L.Ed.2d 178, 121 S.Ct. 1263].) This line of cases stemmed from South Carolina's consistent refusal "to inform the jury of a capital defendant's parole eligibility status." (*Id.* at p. 48, fn. omitted; see also *Ramdass v. Angelone* (2000) 530 U.S. 156 [147 L.Ed.2d 125, 120 S.Ct. 2113]; *Kelly v. South Carolina* (2002) 534 U.S. 246 [151 L.Ed.2d 670, 122 S.Ct. 726].) The alternative to a death sentence was described in these cases as "life imprisonment." (*Shafer, supra,* at p. 48.) The Supreme Court held it to be error for the trial court under these circumstances to reply to a jury question about a defendant's parole eligibility by saying that the jury was not to consider parole eligibility in reaching its verdict, when the defendant is in fact not legally eligible for parole.

Defendant's attempt to draw a parallel between this line of cases and the present one is unavailing. Here, the jury was instructed that life imprisonment was "without the possibility of parole." When asked by the jury whether "without the possibility of parole" was in effect literally true, the trial court appropriately responded: "If you select life without possibility of parole, you are to assume that the defendant will never be released from prison." Unlike the South Carolina courts, the trial court was in no way being coy or uninformative about the nature of the life sentence, but rather reaffirmed that the phrase "without possibility of parole" was to be taken literally. In fact, the answer is very similar to the one given in *People v. Turner* (2004) 34 Cal.4th 406, 436–438 [20 Cal.Rptr.3d 182, 99 P.3d 505]. In response to the jury's question of whether life imprisonment without parole " 'mean[s] exactly what it implies,' " and related questions (*id.* at p. 436), the trial court stated: " 'For the purpose of your deliberations, you are to assume life *without the possibility of parole* means what it says.' " (*Id.* at p. 437, italics added.) We held the response was not error. "By informing the jury that '*life without the possibility of parole*' (italics added) means 'what it says,' the court effectively told the jury that defendant would be ineligible for parole if the jury chose that sentence." (*Id.* at p. 438.) In the present case, we find no error in the trial court's similar response.

Defendant also claims error from the trial court's failure to directly address the question of appeals. In the present case, defendant points out that while his death judgment was automatically appealed, a sentence of life imprisonment without parole after having pleaded guilty to first degree murder and

special circumstances would likely not have resulted in an appeal. He argues that the jury should have been so informed, so that it would not feel as though the death sentence needed to be imposed in order to prevent defendant from escaping life imprisonment by a successful appeal. But even with a guilty plea, defendant could still appeal his murder conviction after obtaining a certificate of probable cause. (§ 1237.5.) It is inappropriate for the jury to speculate about what may occur on appeal, and the trial court was correct not to address that question directly.

### Q. *Juror Misconduct*

Shortly after the jury rendered its verdict, it was discovered that several pages copied from a Bible had been brought into the jury room. Defendant eventually moved for a new trial based on juror misconduct related to the use of those biblical passages during deliberations. After a hearing during which several jurors were called as witnesses, the trial court denied the motion. Defendant contends on appeal that the trial court erred, and that such jury misconduct violated defendant's rights under the First, Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution.

### 1. *Facts*

While cleaning out the room in which jury deliberations had taken place, a court staff member found several pages copied from a Bible in a juror's notebook, although the staff person did not note which juror's notebook they had come from. The biblical passages consisted of several verses from First Corinthians and Romans. The trial court eventually granted defendant's motion to obtain juror address and phone information. After an investigation, counsel filed a motion for a new trial on grounds of jury misconduct. The motion was supported by declarations from two jurors. Juror S.M. indicated that the initial poll showed jurors to be nine to three in favor of death and shortly thereafter 10 to 2 in favor of death. One of the jurors initially not voting for death, K.Y., "was very emotional and appeared to be having a hard time making a decision."

A male juror suggested that "the Scriptures may make her feel at ease with a decision." The juror, who later was identified as T.F., at one point read portions of the Bible aloud. H.B., who was the other juror who did not vote in favor of death during the first day of deliberations, stated in a declaration that T.F. was using scripture to "comfort" K.Y., and H.B. specifically remembered him reciting the portion of First Corinthians about "killing the flesh to save the soul," found in First Corinthians, chapter 5, verse 5.

The trial court held an evidentiary hearing at which Jurors T.F. and K.Y. testified. T.F. testified that he was prompted to copy biblical verses, possibly

during the lunch break, on the first day and to read them because K.Y. said something to the effect that "doesn't the Bible say you are not supposed to judge." He had read from First Corinthians, chapter 6, verses 1 through 3, and Romans, chapter 13, verses 1 through 4, possibly 5. He denied reading from First Corinthians chapter 5. He did not recall if there was discussion about the biblical passages after they were read or further discussion about the Bible. The next day, the jury reached its verdict.

K.Y. testified that she recalled that certain biblical verses were read, but that she did not request they be read. She could not recall anything about the content of those verses. K.Y. and T.F. both testified that when she explained her reason to decide to vote for death the following day, there was no reference to the Bible or religion.

The People subsequently filed a memorandum of points and authorities opposing the new trial motion, which was also supported by a declaration from H.B. The declaration made clear that immediately after the Bible reading, H.B. had stated words to the effect that religion should play no part in the decision, and that the jurors had to consider man's law not God's law in deciding this case. Juror C.R. also submitted a declaration confirming that H.B. had made the above statement, and that religion was not discussed after the biblical passages had been read. Juror B.H. stated in a declaration that a vote taken after the reading later that afternoon was still 10 to 2.

Taking Jurors H.C.'s and T.F.'s testimony together, and taking portions that were underlined by hand in the original court exhibit, the following passages were either read, in the jury room, or underlined by a juror:

"1 It is reported commonly *that there is* fornication among you, and such fornication as is not so much as named among the Gentiles, that one should have his father's wife.

"2 And ye are puffed up, and have not rather mourned, that he that hath done this deed might be taken away from among you.

"3 For I verily, as absent in body, but present in spirit, have judged already, as though I were present, *concerning* him that hath so done this deed,

"4 In the name of our Lord Jesus Christ, when ye are gathered together, and my spirit, with the power of our Lord Jesus Christ,

"5 To deliver such an one unto Satan for the destruction of the flesh, that the spirit may be saved in the day of the Lord Jesus." (First Corinthians, ch. 5, italics in printed edition; hand underscoring in original court exhibit.)

"1 DARE any of you, having a matter against another, go to law before the unjust, and not before the saints?

"2 Do ye not know that the saints shall judge the world? And if the world shall be judged by you, are ye unworthy to judge the smallest matters?

"3 Know ye not that we shall judge angels? How much more things that pertain to this life?" (First Corinthians, 6:1–6:3.)

"1 LET every soul be subject unto the higher powers. For there is no power but of God: The powers that be are ordained of God.

"2 Whosoever therefore resisteth the power, resisteth the ordinance of God: and they that resist shall receive to themselves damnation.

"3 For rulers are not a terror to good works, but to the evil. Wilt thou then be afraid of the power? Do that which is good, and thou shalt have praise of the same:

"4 For he is the minister of God to thee for good. But if thou do that which is evil, be afraid; for he beareth not the sword in vain; for his is the minister of God, a revenger to *execute* wrath upon him that doeth evil.

"5 Wherefore *ye* must needs be subject, not only for wrath but also for conscience sake.

"6 For this cause pay ye tribute also: For they are God's ministers, attending continually upon this very thing." (Romans, ch. 13, original italics, underscoring in court exhibit.)

After T.F. read the Bible verses, he handed them to another juror, whom he believed "could have been" K.Y.

The trial court found as a matter of fact that no discussions took place about the biblical verses after they were read by T.F. The court found that it was unclear from the testimony who underlined the biblical verses. The court concluded that First Corinthians, chapter 5 had not been read aloud. The court further concluded that, based on the content of the biblical passages, a layperson would not read them to dictate that the penalty decision should be made according to religious law rather than secular law, and therefore concluded that there was no substantial likelihood that these passages influenced jurors. The trial court accordingly denied the new trial motion.

## 2. *Principles of Law and Application to the Present Case*

### a. *Misconduct*

 "It is misconduct for a juror to consider material [citation] extraneous to the record. [Citations.] Such conduct creates a presumption of prejudice that may be rebutted by a showing that no prejudice actually occurred." (*People v. Mincey* (1992) 2 Cal.4th 408, 467 [6 Cal.Rptr.2d 822, 827 P.2d 388].)

 This court has held that reading aloud from the Bible or circulating bibilical passages during deliberations is misconduct. (See *People v. Danks* (2004) 32 Cal.4th 269, 308 [8 Cal.Rptr.3d 767, 82 P.3d 1249] (*Danks*); *People v. Mincey, supra,* 2 Cal.4th at pp. 466–467.) The Attorney General concedes that bringing biblical passages into the jury room and reading them aloud during deliberation constitutes misconduct.

### b. *Prejudice*

 "[W]hen misconduct involves the receipt of information from extraneous sources, the effect of such receipt is judged by a review of the entire record, and may be found to be nonprejudicial." (*In re Carpenter* (1995) 9 Cal.4th 634, 653 [38 Cal.Rptr.2d 665, 889 P.2d 985].)

A court's inquiry into whether extraneous material influenced the jury verdict is limited by Evidence Code section 1150, subdivision (a), which states: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

 When misconduct is found, there is a presumption of prejudice that " ' " 'may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party [resulting from the misconduct]. . . .' " ' " (*In re Carpenter, supra,* 9 Cal.4th at p. 653, italics omitted.)

 Speaking in reference to the introduction of extraneous material to jurors, we explained: "The verdict will be set aside only if there appears a

substantial likelihood of juror bias. Such bias can appear in two different ways. First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror. [Citations.] Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant. [Citation.] The judgment must be set aside if the court finds prejudice under either test." (*In re Carpenter, supra,* 9 Cal.4th at p. 653, italics omitted.)

In assessing whether prejudice occurred here, we look to the recent case of *Danks, supra,* 32 Cal.4th 269. There, a new trial motion was filed alleging juror misconduct. The declarations filed in support thereof attested to misconduct by two jurors. After the first day of penalty deliberations on Friday, Jurors K.A. and B.P. independently spoke to their pastors over the weekend in ways the defendant contended were improper. (*Danks, supra,* 32 Cal.4th at pp. 297–301.) That Monday, K.A. brought pages from the Book of Numbers into the jury room and passed them around to other jurors, stating that the passage had given her comfort.[10]

This court held that K.A. had committed misconduct, but that it was not prejudicial. The court concluded the biblical verses K.A. circulated were not inherently prejudicial, based largely on the strength of the underlying penalty phase evidence. (*Danks, supra,* 32 Cal.4th at p. 305.) The court also concluded the sharing of biblical verses did not result in actual bias. "Juror K.A. 'merely shared [her] personal view and did not purport to validate it as truth or impose [her] view on others.' [Citation.] Indeed, there is no evidence that after the copy circulated the passages were even discussed, other than perhaps one juror's comment that God did not have a role in the jury's decision." (*Danks, supra,* 32 Cal.4th at p. 308.)

It is true that the strength of the aggravating evidence against defendant in the present case may not have been comparable to the evidence against Danks, a remorseless multiple murderer who "strongly implied he would continue to be violent in a controlled setting, and apparently threatened the jury." (*Danks, supra,* 32 Cal.4th at p. 305.) Nonetheless, the biblical verses

---

[10] That biblical passage stated in part: " 'If anyone with malice aforethought shoves another or throws something at him intentionally so that he dies or if in hostility he hits him with his fist so that he dies, that person shall be put to death; he is a murderer. The avenger of blood shall put the murderer to death when he meets him. [¶] But if without hostility someone suddenly shoves another or throws something at him unintentionally or, without seeing him, drops a stone on him that could kill him, and he dies, then since he was not his enemy and he did not intend to harm him, the assembly must judge between him and the avenger of blood according to these regulations. The assembly must protect the one accused of murder from the avenger of blood and send him back to the city of refuge to which he fled.' " (*Danks, supra,* 32 Cal.4th at p. 298, fn. 10.)

read in this case from Romans, chapter 13 and First Corinthians, chapter 6, unlike the verse from the Book of Numbers in *Danks*, did not propound an alternative set of rules or standards about when the death penalty should be imposed, but merely counseled deference to governmental authority and affirmed the validity of sitting in judgment of one's fellow human beings according to the law. Although we do not hold that the reading of such verses can never be prejudicial, we believe that in the present context jurors would understand the verses as a response to a particular juror's doubts about whether the Bible authorized her to sit in judgment, not as a means of advancing a religiously based argument in favor of the death penalty for defendant. We therefore conclude that the biblical verses were not "inherently and substantially likely to have influenced" a juror. (*In re Carpenter*, *supra*, 9 Cal.4th at p. 653.)

■ Furthermore, H.B.'s remark after the Bible reading that jurors were not to consider such verses in arriving at a verdict reinforced the limited manner in which the biblical verses were used. The fact that the jurors did not discuss the verses is an indication that they took H.B.'s admonition to heart, and weighs against a finding of prejudice. (See *Danks*, *supra*, 32 Cal.4th at p. 308.) And the fact that a vote taken that afternoon, after the biblical verses were read, showed the same 10-to-2 split among jurors, tends to undercut defendant's contention that the reading was the decisive event in changing K.Y.'s mind. Nor is there any indication that the reader of the verses, T.F., was animated by bias against the defendant. Thus, we conclude from "the nature of the misconduct and the surrounding circumstances" that it was not "substantially likely" that any juror was "actually biased against the defendant" as a result of the reading. (*In re Carpenter*, *supra*, 9 Cal.4th 653.)

Defendant cites *People v. Harlan* (Colo. 2005) 109 P.3d 616 (*Harlan*) in support of his position. The defendant in *Harlan* had been sentenced to death for the kidnapping, rape and murder of one woman and the shooting of another woman. (*Id.* at p. 619.) The trial court eventually granted the defendant's motion to vacate the verdict on grounds of jury misconduct. The trial court found: "(1) one or more jurors brought a Bible, a Bible index, and hand-written notes containing the location of biblical passages into the jury room to share with another juror during deliberations in the penalty phase of defendant's trial; (2) these extraneous materials contained a passage commanding the death penalty for murderers and another instructing obedience to civil authorities; and (3) these passages were pointed out by at least one juror to another juror before the jury reached its unanimous verdict imposing the death sentence." (*Id.* at pp. 619–620.) Two of the biblical passages identified as shared with other jurors were the eye-for-an-eye passage from Leviticus chapter 24, verses 20 through 21, and the passage from Romans, chapter 13, verse 1 read in the present case: " '[l]et every soul be subject to the governing

authorities for there is no authority except from God and the authorities that exist are appointed by God.' " (109 P.3d at p. 622.)

The Colorado Supreme Court held that such jury misconduct would be considered prejudicial if there was "a reasonable possibility that the extraneous information influenced the verdict to the detriment of the defendant." (*Harlan, supra,* 109 P.3d. at p. 625.) In arriving at its conclusion that the sharing of the biblical passages was prejudicial, the court considered six factors: (1) that the biblical passages were directly related to the ultimate issue of the case, i.e., the sentence of life or death; (2) that the biblical passages would be considered authoritative by typical jurors; (3) that the information was shared by others in the jury room; (4) that the information was considered before the jury reached its verdict; (5) that there was a reasonable possibility that both the Leviticus and Romans passages would influence a typical juror to vote in favor of death. (*Id.* at pp. 630–631.) As to this last point, the court stated: "The Romans text instructs human beings to obey the civil government. Here, the State of Colorado was seeking the death penalty. If the jury was unable to reach a unanimous verdict of death, the trial court would have been required to impose a life sentence without the possibility of parole. Drawn from an array of typical jurors in Colorado, at least one juror in this case could have been influenced by these authoritative passages to vote for the death penalty when he or she may otherwise have voted for a life sentence." (*Id.* at p. 631.)

 Although *Harlan* does provide some support for defendant's position, we are not persuaded by it. First, the particular context in which the biblical readings occurred in this case in response to a juror query about biblical views on judgment was not present in *Harlan.* Second, the jury in *Harlan* heard an eye-for-an-eye passage that, as discussed above, has a greater potential for prejudice than the passages read here. Finally, as noted above, the Colorado Supreme Court has adopted a "reasonably possible" standard for determining whether jury misconduct resulted in prejudice at the penalty phase of a capital trial. (*Harlan, supra,* 109 P.3d at p. 625.) We have adopted a higher "reasonably probable" prejudice standard for jury misconduct, including misconduct at the penalty phase of a capital trial, whereby the extraneous material to which jurors are exposed must be inherently likely to prejudice a juror, or there must be facts from which it can be concluded that there was substantial likelihood of actual bias. (*In re Carpenter, supra,* 9 Cal.4th at p. 653.) As discussed above, on the record before us defendant does not meet that standard.

We therefore hold that the jury misconduct in this case was not prejudicial.

R. *Trial Court's Consideration of Probation Report Prior to the Ruling on the Section 190.4 Motion*

■ The trial court read defendant's probation report prior to ruling on the automatic motion to modify the penalty pursuant to section 190.4 and defendant claims prejudicial error in violation of his statutory and due process rights. As we have stated: "In ruling on an application for modification of the verdict, the trial court may only rely on evidence that was before the jury. [Citation.] Therefore, the better procedure is to rule on the application for modification before reading the probation report." (*People v. Navarette* (2003) 30 Cal.4th 458, 526 [133 Cal.Rptr.2d 89, 66 P.3d 1182].) But reading the probation report before ruling on the section 190.4 motion is not prejudicial error when "nothing in the record suggests the court considered or relied on the probation report . . . when ruling on the application for modification." (30 Cal.4th at p. 526.)

In the present case there is no suggestion the trial court considered or relied upon the probation report in making its ruling. On the contrary, when the prosecution referred to material in the report while arguing the section 190.4 motion, the trial court sustained the defense's objection, stating that he could not "consider the probation report in reviewing this matter." The court also alluded vaguely to "other convictions" of defendant while explaining this ruling on the section 190.4 motion, and defendant contends those convictions were ones that were only set forth in the probation report. Whether or not that is the case, the trial court made clear that it was not going to find those convictions to be factors in aggravation because they did not involve violence. We conclude there was no prejudice resulting from the trial court's prior reading of the probation report.

S. *Constitutional Challenges to the Death Penalty Statute*

Defendant challenges a number of California's death penalty provisions as unconstitutional. Defendant contends that the failure to require written findings from the jury regarding aggravating factors violates his right to meaningful appellate review. We have consistently rejected this claim. (*People v. Avila, supra,* 38 Cal.4th 491, 614–615; *People v. Morrison* (2004) 34 Cal.4th 698, 730 [21 Cal.Rptr.3d 682, 101 P.3d 568].) He contends that the jury should have been required to find all aggravating factors beyond a reasonable doubt before imposing the death penalty. We have held that the jury need not " 'find beyond a reasonable doubt that an aggravating circumstance is proved (except for other crimes)' " (*People v. Avila, supra,* 38 Cal.4th at p. 614). Defendant argues we should reconsider our position, based on *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428]. "We repeatedly have

held that neither *Apprendi v. New Jersey*[, *supra,*] 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] nor *Ring v. Arizona*[, *supra,*] 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] affects California's death penalty law . . . ." (*People v. Morrison, supra,* 34 Cal.4th at p. 731.)

Defendant contends that jurors are constitutionally required to unanimously agree on which factor they find in aggravation. We have rejected this argument. (*People v. Morrison, supra,* 34 Cal.4th at pp. 730–731.) The United States Supreme Court case, *Richardson v. United States* (1999) 526 U.S. 813, 815–816 [143 L.Ed.2d 985, 119 S.Ct. 1707], which defendant uses to support this argument, is not on point. *Richardson* involved sentencing factors for defendants convicted of the federal drug crime of continuing criminal enterprise.[11] (*Richardson,* at p. 816.) The court held that a jury must unanimously agree not only that the defendant committed some continuing series of violations, but also about which specific violations make up that continuing series. (*Id.* at p. 824.) *Richardson* has no application to California's death penalty determination, which involves not a jury finding of guilt but a weighing of numerous factors to arrive at an appropriate sentence. Nor does *Ring v. Arizona* alter our conclusion on the unanimity issue. (*People v. Morrison, supra,* 34 Cal.4th at pp. 730–731.)

Defendant contends that the lack of intercase proportionality review for death penalty cases is unconstitutional. This court has repeatedly held that proportionality review in such circumstances is not required. (*People v. Anderson* (2001) 25 Cal.4th 543, 602 [106 Cal.Rptr.2d 575, 22 P.3d 347]; see *Pulley v. Harris* (1984) 465 U.S. 37, 50–51 [79 L.Ed.2d 29, 104 S.Ct. 871].)

Defendant contends that the use of the adjective "extreme" in section 190.3, factor (g)[12] is unconstitutionally vague and bars evidence of duress that was less than extreme. We have rejected defendant's contention. Such terms have "commonsense meanings which the jury may be expected to apply" and are not impermissibly vague. (*People v. Arias, supra,* 13 Cal.4th at p. 189.) Moreover, section 190.3, factor (k) permits the jury to consider less extreme forms of duress in mitigation. (*People v. Bacigalupo* (1993) 6 Cal.4th 457, 469 [24 Cal.Rptr.2d 808, 862 P.2d 808].)

---

[11] A continuing criminal enterprise occurs when a person "(1) . . . violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and [¶] (2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter—[¶] (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management and [¶] (B) from which such person obtains substantial income or resources." (21 U.S.C. § 848(c).)

[12] Section 190.3, factor (g) has the jury consider "[w]hether or not defendant acted under extreme duress or under the substantial domination of another person."

Defendant asserts that California's death penalty statute does not narrow the class of murderers selected for death. As we have held, "California's death penalty law sufficiently narrows the class of death-eligible defendants." (*People v. Marks* (2003) 31 Cal.4th 197, 237 [2 Cal.Rptr.3d 252, 72 P.3d 1222].)

Defendant contends that broad prosecutorial discretion in deciding whether to seek the death penalty violates the equal protection clause and is unconstitutional. This court has recognized the legitimacy of prosecutorial discretion unless there is a " 'persuasive showing to the contrary.' " (*People v. Keenan* (1988) 46 Cal.3d 478, 506 [250 Cal.Rptr. 550, 758 P.2d 1081].) Defendant makes no such showing in this case.

### T. *Cumulative Error*

Defendant contends various penalty phase errors are, taken together, prejudicial and require reversal of the death sentence. Finding no individual prejudicial error, we also conclude there is no cumulative prejudice.

### III. DISPOSITION

The judgment is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.

**CORRIGAN, J.,** Concurring.—I concur in the affirmance of the judgment, but express caution regarding the jury selection discussion.

The majority assumes, without deciding, that *Miller-El v. Dretke* (2005) 545 U.S. 231 [162 L.Ed.2d 196, 125 S.Ct. 2317], compels a comparative analysis of the cold record on review of a *Wheeler/Batson* challenge. (Maj. opn., *ante*, at p. 312.) I agree that such an assumption is prudent here. I write separately to voice concern that a cold-record review is a particularly questionable method for achieving the important goal that jury selection be untainted by group bias.

There are a great many legitimate factors that an advocate may properly consider in the exercise of peremptory challenges. Many of these are subtle nuances, including attitude, tone of voice, facial expression, and the like. These nuances are seldom captured by the written record. Further, an advocate may be willing to accept a juror who shares some characteristics with an excused juror because of other life experiences or views that make the accepted juror less problematic from the advocate's perspective.

Jury selection is, and should be, a highly individualized process. Juror by juror consideration encourages just the opposite of group bias.

Baxter, J., and Chin, J., concurred.

Appellant's petition for a rehearing was denied March 21, 2007.