Filed 5/24/22  P. v. Pollard CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C092777 |
| Plaintiff and Respondent, | (Super. Ct. No. STK-CR-FE-2018-6557) |
| v. | |
| WILLIAM TORRIE DELANO POLLARD, | |
| Defendant and Appellant. | |

Defendant William Torrie Delano Pollard shot a woman in the face and hand as her boyfriend drove her and three young children to school.  A jury found defendant guilty of five counts of assault with force likely to produce great bodily injury, one count of being a felon in possession of a firearm, and found true multiple enhancements.  On appeal, defendant contends the trial court erred by denying his *Batson/Wheeler*[1] motion

---

[1]  *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69] (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*), overruled in part by *Johnson v. California* (2005) 545 U.S. 162, 173 [162 L.Ed.2d 129, 141].

1

and by declining to instruct the jury on a theory of self-defense. Defendant also argues that he is entitled to resentencing under Assembly Bill No. 124 (2021-2022 Reg. Sess.) (Assembly Bill 124). We will remand the matter for resentencing in accordance with the new legislation, but affirm the judgment in all other respects.

FACTUAL AND PROCEDURAL BACKGROUND

A.      *Factual history*

One morning, Harvey S. was driving his girlfriend, Rayleen A., to her daughter's school. Their three-year-old son was in the backseat, along with Rayleen's seven-year-old daughter and Harvey's two-year-old son. They drove past an intersection, where Harvey and Rayleen saw defendant in his car waiting at a red light in the left turn lane. At the time, defendant was dating Harvey's ex-girlfriend, who is the mother of one of Harvey's children.

Upon seeing defendant, Harvey said to Rayleen, " 'Look at that bitch ass [N-word].' " As Harvey continued driving, defendant moved his car out of the turn lane and sped in their direction. Defendant tried to drive up beside Harvey's car in the right lane, but Harvey pulled in front of him. Defendant moved his car left and pulled alongside Harvey's car. Rayleen looked to the left and saw a "flash" as defendant began shooting through the passenger side window of his car. She heard approximately five gunshots. Bullets struck Rayleen's chin and right middle finger. No one else in the vehicle was hit. No one in Harvey's vehicle possessed a gun at the time of the shooting. Police later found two other bullet holes in Harvey's car; one in the rear left passenger door and one in the left tail light.

Asad S. witnessed the shooting as he drove behind both cars, and he called 911. Asad told the dispatcher that he "believe[d]" that both cars were struck by bullets because he saw glass on the ground. At trial, Asad testified that did not see windows break or know where the glass came from. Asad did not see anyone holding a gun and could not tell which car the shots came from. Harvey drove Rayleen to the hospital, where she was

2

treated for serious injuries on her face and finger, which required several subsequent surgeries.

B.    *Procedural history*

The jury found defendant guilty of five counts of assault likely to cause great bodily injury (Pen. Code, § 245, subd. (a)(4))[2] and of being a felon in possession of a firearm (§ 29800, subd. (a)(1)).  With respect to defendant's assault on Rayleen, the jury found true that defendant personally inflicted great bodily injury (§ 12022.7, subd. (a)) and the jury further found defendant personally used a firearm on all the assault counts (§ 12022.5, subd. (a)).  Defendant admitted he had a prior strike conviction (§§ 667, subd. (d), 1170.12, subd. (b)), prior serious felony conviction (§ 667, subd. (a)(1)), and a prior prison term (§ 667.5, subd. (b)).

The trial court sentenced defendant to an aggregate term of 32 years eight months in prison.

DISCUSSION

I

Batson/Wheeler

Defendant argues the trial court erred by overruling his *Wheeler* objection after the prosecutor used a peremptory challenge to excuse an African-American juror, Ms. S., in this case in which defendant is Black.  (*Batson, supra*, 476 U.S. 79; *Wheeler, supra*, 22 Cal.3d 258.)  He contends the trial court's ruling relied on an erroneous characterization of the record, and the prosecutor's purportedly legitimate reasons for excusing Ms. S. were not credible.  We are not persuaded.

---

[2]     Undesignated statutory references are to the Penal Code.

A.  *Additional procedural background*

1.  *Voir dire of Ms. S.*

During voir dire, Ms. S. stated that she is a widow and was previously employed as an accountant. She is also a mother, grandmother, and great-grandmother. Approximately four years earlier, Ms. S. served as a juror in a criminal trial in which the jury reached a verdict. When asked whether she was a leader or a follower, Ms. S. said that she has "control issues" when she is "put in a corner or something like that," but that she would not pressure other jurors to change their minds.

The prosecutor introduced the concept of circumstantial evidence to the prospective jurors. Accordingly, she asked Ms. S. what she would think if she went outside and the sidewalk and street were wet, there were puddles in the street, and people had umbrellas up and raincoats on with raindrops on them. Ms. S. responded, "Just because [a raincoat] has water on it doesn't mean it rained." The prosecutor then asked, "[I]f there's snow on the ground and the night before you went up to that cabin there's no snow on the ground, what does that tell you?" Ms. S. answered, "It doesn't tell me anything." The prosecutor asked Ms. S. if she was driving down the street, and the car in front of her turned on its brake lights and right turn blinker and moved into the righthand turn lane, what did Ms. S. think the car would do. Ms. S. responded, "Turn right." The prosecutor explained that Ms. S. drew that conclusion using circumstantial evidence and asked if she was "suspicious of circumstantial evidence." Ms. S. replied, "No, just the example that you've given. But no."

The prosecutor asked if Ms. S. was saying that she was "okay with the right turn" but "not okay with it raining outside." Ms. S. said, "Right now I don't know what I'm saying because I'm thinking in my head of the example of the car. You know, I'm always looking because that person might decide to go left, although he gets the signal that he's going right. [¶] . . . [¶] So there's always a possibility of something else happening. Does that make sense to you?" The prosecutor answered in the affirmative,

4

and then turned to another example, asking, "[I]f this [microphone] is in my hand and I drop it because I really want to and it breaks, and I pick it up and I say, 'Oh, look,' and you see that it's broken, . . . what do you think about how it got broken?" Ms. S. said, "That you dropped it." The prosecutor explained that Ms. S.'s conclusion was based on direct evidence because she "saw that break." However, the prosecutor continued, if she had dropped it behind a partition such that Ms. S. did not see it drop, but only saw the resulting break, Ms. S. would say, " 'Oh, she just broke it.' " Ms. S. responded, "Okay. All right." The prosecutor said, "I think you're still a little suspicious on that," but Ms. S. said, "No, no, no," and that she was "okay" and agreed she could give circumstantial evidence the same weight as direct evidence.

The prosecutor then asked, "Can you use circumstantial evidence to figure out what's in someone's head, what their intent is?" Ms. S. answered, "How would you know what someone is thinking? I don't have those skills. [¶] . . . [¶] I would have to see the whole picture and, you know, like, all the evidence and how it fits and everything. [¶] . . . [¶] I just can't look at a person and think what they are thinking." The prosecutor asked, "So you would look at maybe physical evidence to conclude?" Ms. S. said, "I would look at all the evidence to conclude."

The prosecutor returned to the microphone asking, hypothetically, "[I]f I take this [microphone] and throw it on the ground, do you need me to say, 'I wanted to break that microphone thing' in order for you to believe that I wanted to break it? Or if I was just walking around and I slammed this thing on the ground, would that tell you something? Is there a difference to you?" Ms. S. responded, "No." The prosecutor said, "It feels like you're guessing what the right answer might be," to which Ms. S. said, "I don't know what you want me to say." The prosecutor said, "I want you to tell me what you think. That's what I want you to say." Ms. S. said, "You really want me [to] tell you what . . . I think? [¶] . . . [¶] I just feel I have to see everything. I have to see the whole puzzle. I

5

can't judge on just one thing just because you dropped it and say, 'Oh, that person's thinking about this.' Whatever. I just need more."

## 2. *The trial court's* Batson/Wheeler *ruling*

The prosecutor exercised a peremptory challenge against Ms. S. Defendant brought a *Batson/Wheeler* motion, arguing that Ms. S. and defendant are both African-American, and there was not a race-neutral reason for the prosecution to challenge Ms. S. The trial court found defendant made a prima facie case because Ms. S. "fit into the classification for which such a motion can be made."

In response, the prosecutor explained that she excused Ms. S. because she had "extreme difficulty understanding the concept" of using circumstantial evidence to prove intent, while "none of the other jurors had that issue. They all readily understood the concept and agreed with it. She did not." The prosecutor continued, "I talked about if I dropped [the microphone] and I picked it up and it was cracked. And she even had difficulty with that concept." The prosecutor also cited Ms. S.'s statement that she could not know what was in someone's mind as problematic regarding her understanding of circumstantial evidence. She argued that "the People are concerned specifically because of her inability to comprehend and be willing to apply circumstantial evidence to determine a person's intent because that's going to be extremely important in this case," where "the charges are premeditated, willful, and deliberate. There's also a kill zone theory . . . ." Finally, the prosecutor expressed concern that Ms. S.'s statement, " 'I don't know what you want me to say,' " or, " 'I don't know what you want me to tell you,' " suggested that she is going to "say anything to, in essence, to appease me or to address whatever my concern is." Defense counsel responded that Ms. S. answered the questions intelligently and showed she understood the concept of circumstantial evidence.

The trial court denied the motion. It first acknowledged Ms. S. was not the only person who questioned whether one could know what another person is thinking, observing that another juror made a similar comment but was excused for hardship.

6

However, the trial court referenced the prosecutor's microphone hypothetical, noting that the prosecutor asked Ms. S. to draw an inference where she "threw [the microphone] down" behind the partition while acting it out. The trial court concluded, "[T]hat example about [the microphone]—without the instruction of telling them how to weigh circumstantial evidence as opposed to direct evidence is murky.· But that example of throwing down with force—and [the prosecutor] acted it out—and then [Ms. S.'s] answers in response to that, and also that answer, 'well, what do you want me to say,' I do find that that is a race-neutral basis for the exclusion and I am going to deny the Wheeler motion."

### B. *Applicable legal principles*

"The 'Constitution forbids striking even a single prospective juror for a discriminatory purpose.' [Citation.]" (*Foster v. Chatman* (2016) 578 U.S. 488, 499 [195 L.Ed.2d 1, 12].) But a showing of discriminatory purpose remains essential in a case challenging the strike of a juror, and the defendant carries the burden of persuasion to prove purposeful discrimination. (*Johnson v. California, supra*, 545 U.S. at pp. 170-171.)

A showing of discriminatory purpose is made by way of a three-step inquiry: " 'First, the defendant must make a prima facie showing that the prosecution exercised a challenge based on impermissible criteria. Second, if the trial court finds a prima facie case, then the prosecution must offer nondiscriminatory reasons for the challenge. Third, the trial court must determine whether the prosecution's offered justification is credible and whether, in light of all relevant circumstances, the defendant has shown purposeful race [or other protected category] discrimination.' [Citation.]" (*People v. O'Malley* (2016) 62 Cal.4th 944, 974.)

Here, the trial court found that defendant made a prima facie showing, so the burden shifted to the prosecutor to explain her conduct by providing "a ' "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the

7

challenges.' [Citation.] 'The justification need not support a challenge for *cause,* and even a "trivial" reason, if genuine and neutral, will suffice.' [Citation.] A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons. [Citations.] Nevertheless, although a prosecutor may rely on any number of bases to select jurors, a legitimate reason is one that does not deny equal protection. [Citation.] Certainly a challenge based on racial prejudice would not be supported by a legitimate reason." (*People v. Lenix* (2008) 44 Cal.4th 602, 613 (*Lenix*), original italics.)

"At the third stage of the *Wheeler*/*Batson* inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' [Citation.] In assessing credibility, the court draws upon its contemporaneous observations of the voir dire. It may also rely on the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her. [Citation.]" (*Lenix, supra*, 44 Cal.4th at p. 613, fn. omitted; accord, *People v. Jones* (2011) 51 Cal.4th 346, 360.)

    C.    *Standard of review*

The parties disagree over the applicable standard of review. While acknowledging we typically defer to the trial court's *Batson/Wheeler* ruling on appeal, defendant argues that de novo review is appropriate here because the trial court and prosecutor mischaracterized the record during oral argument. We find no basis to stray from deferential review.

"Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] 'We review a trial court's determination regarding the sufficiency of a prosecutor's

8

justifications for exercising peremptory challenges " 'with great restraint.' " [Citation.] . . . So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]' [Citation.]" (*Lenix, supra*, 44 Cal.4th at pp. 613-614, fn. omitted.) However, deference is not appropriate where the record provides "no support" for the prosecutor's stated reasons and the trial court fails to question the prosecutor's demonstrably false rationale. (See *People v. Silva* (2001) 25 Cal.4th 345, 385-386.)

Defendant first contends the trial court's findings are not entitled to substantial evidence review because the prosecutor erroneously stated, and the trial court accepted, that Ms. S.'s inability to comprehend circumstantial evidence to discern a person's intent was unique among the prospective jurors. Defendant cites Juror No. 10's responses, whom the prosecutor questioned immediately after Ms. S.

Juror No. 10 said, "I don't think you can judge what someone is thinking," and that to know what someone is thinking, "you have to look at everything that happened, what was leading up to it happening." The prosecutor said, "But you still are using that information to make a conclusion about what's in someone's mind, what their intent is?" Juror No. 10 responded, "I suppose. Yes." The prosecutor asked, "And do you have a problem doing that? Like, do you feel like you would not be able to use evidence in front of you to determine what's in someone's mind? Because, ultimately, like I discussed with one of the other juror's, intent is always an issue in every criminal case, so you are going to have to figure that out. So the question becomes how are you going to do that." Juror No. 10 answered, "I think you have to examine everything that's in front of you in deciding what happened."

Thus, while Juror No. 10 represented she would have to "look at everything" to determine someone's state of mind, she understood the concept of using evidence to discern intent, and readily agreed that she could do so. Ms. S., on the other hand, refused, or was unable, to consider the circumstantial evidence in various hypotheticals. For

example, Ms. S. said that if there was snow on the ground when, the night before, there was none, that "doesn't tell [her] anything," that a car with a right turn signal in the right lane might still turn left, and that she was suspicious of the examples of circumstantial evidence given by the prosecutor. She also concluded her conversation with the prosecutor by saying she "need[ed] more" than the circumstantial evidence in the microphone hypothetical to draw any conclusions. Thus, the prosecutor's statement that Ms. S. uniquely struggled with the concept of circumstantial evidence was generally supported by the record. Moreover, the trial court did not uncritically accept the prosecutor's statement that Ms. S. was the sole juror to question circumstantial evidence. Rather, at the beginning of its ruling, it noted that another potential juror—not Juror No. 10—questioned whether she could discern someone's thoughts before that other juror was dismissed for hardship.

Similarly, and contrary to defendant's second contention, the trial court did not misrepresent that Ms. S.'s question, " '[W]ell, what do you want me to say?' ", was made in direct response to the microphone hypothetical. Indeed, neither the prosecutor nor the trial court relied on Ms. S.'s question as directly responsive to the microphone hypothetical. Rather, the prosecutor referenced this question as evidence that Ms. S. was inclined to say anything to please the prosecutor, not necessarily as evidence of her difficulty with the concept of circumstantial evidence. As a result, the trial court appeared to cite that question as an independent nondiscriminatory basis for exclusion, separate from Ms. S.'s grasp of circumstantial evidence. Specifically, the trial court cited the microphone hypothetical "and then [Ms. S.'s] answers in response to that, *and also that answer*, 'well, what do you want me to say' " as legitimate bases for the prosecutor's peremptory challenge. (Italics added.)

More generally, the trial court heard argument from both parties and made a reasoned conclusion based on the record. Accordingly, "[n]othing in the record suggests that the trial court either was unaware of its duty to evaluate the credibility of the

10

prosecutor's reasons or that it failed to fulfill that duty." (*People v. Lewis* (2008) 43 Cal.4th 415, 471, overruled on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919-920.) As the trial court "engaged in a reasoned examination of [the prosecutor's] showing in light of the record, . . . its findings are entitled to ' " 'great deference' and will not be overturned unless clearly erroneous." ' " (*People v. Armstrong* (2019) 6 Cal.5th 735, 768.)[3]

    D.    *Analysis*

        1.    *Substantial evidence review*

Substantial evidence supports the trial court's conclusion that the prosecutor provided sufficient, race-neutral justifications for exercising its preemptory challenge against Ms. S. During voir dire, the prosecutor addressed whether the prospective jurors could use circumstantial evidence to infer intent, as it was at the crux of the case. Ms. S. resisted the concept despite multiple attempts by the prosecutor to illustrate the concept. She first asserted that a wet raincoat "doesn't mean it rained," while failing to consider the other elements in the hypothetical, including umbrellas, a wet street, and puddles. She further insisted in response to another hypothetical that the presence of snow on the ground at a cabin at which there previously was no snow did not "tell [her] anything." And while Ms. S. initially agreed that a car in the right turn lane with brake lights and a right turn signal indicated that the car would turn right, she then backtracked, saying "that person might decide to go left, although he gets the signal that he's going right. [¶] . . . So there's always a possibility of something else happening." Moreover, Ms. S. asserted

---

**3**    Relying on *Snyder v. Louisiana* (2008) 552 U.S. 472, 479-480 [170 L.Ed.2d 175, 182], defendant also argues in a footnote that where similarly situated jurors of different races are treated differently, the deferential standard of review is inappropriate. However, *Snyder*, like other relevant authorities, supports only the general proposition that deferential review is inappropriate where the trial court uncritically accepts a party's erroneous representation of the record or otherwise misrepresents the record. (*Ibid*.; see *People v. Armstrong, supra*, 6 Cal.5th at p. 768.)

11

she was not suspicious of circumstantial evidence, but that she was suspicious of the examples the prosecutor had given. Finally, when the prosecutor asked Ms. S. what she could infer from the prosecutor slamming her microphone to the ground and the microphone breaking, Ms. S. said she "need[ed] more" information before she could reach a conclusion. And although Ms. S. confirmed that she could give circumstantial evidence the same weight as direct evidence, she then suggested she could not use circumstantial evidence to determine a person's intent, asking, "How would you know what someone is thinking? I don't have those skills." Thus, the record supports the prosecutor's contention, and the trial court's finding, that Ms. S. was properly excluded for struggling to understand, or otherwise resisting, the concept of circumstantial evidence.[4]

Additionally, the prosecutor's related concern that Ms. S. might say anything to appease her was supported by substantial evidence. After some resistance, Ms. S. accepted the microphone hypothetical. However, when the prosecutor told Ms. S. she felt like she was "guessing" when she agreed there was no difference between direct and circumstantial evidence in that context, Ms. S. responded, "I don't know what you want me to say." The prosecutor assured Ms. S. that she wanted Ms. S. to "tell me what you think," yet Ms. S. still expressed doubt that she should respond with candor, asking, "You really want me [to] tell you what . . . I think?" When the prosecutor confirmed again that she really wanted Ms. S. to tell her what she thought, Ms. S. retracted her agreement with

---

[4]    In reaching this conclusion, we reject defendant's argument, made primarily in a footnote in his opening brief and substantively on reply, that the prosecution's assertion that Ms. S. had "extreme difficulty understanding the concept of using circumstantial . . . evidence" and an "inability to comprehend" it reflected the prosecutor's subconscious bias based on stereotypes about African-Americans. As discussed, the record supports the prosecutor's contention that Ms. S. did, in fact, have difficulty either understanding or accepting the concept of circumstantial evidence and consequently might resist relying on it at trial.

the microphone hypothetical, saying, "I can't judge on just one thing just because you dropped it and say, 'Oh, that person's thinking about this.' Whatever. I just need more."

One could reasonably infer from these answers, as the prosecutor and trial court did here, that Ms. S. might have shaded her responses in an effort to satisfy the prosecutor rather than respond with full transparency. Specifically, although Ms. S. eventually agreed with the prosecutor that direct and circumstantial evidence had equal value in the microphone hypothetical, when assured she should tell the truth, Ms. S. seemingly withdrew her agreement. Based on the foregoing, the trial court did not err in crediting the prosecutor's rationale as legitimate, race-neutral bases for exclusion.[5]

---

**5**     After briefing was complete in this matter, defendant filed a notice of new authority under California Rules of Court, rule 8.254, citing *People v. Salinas* (2022) 77 Cal.App.5th 20 (*Salinas*), in which a divided panel reversed the trial court's denial of a *Batson/Wheeler* motion. While *Salinas* facially appears to share some commonalities with this case, it is factually distinguishable in ways that limit its application here.

    For example, in *Salinas*, the appellate court gave no deference to the trial court's ruling because the trial court admitted it did not keep notes on the juror's responses during voir dire, did not give the defendant an opportunity to respond to the prosecution's proffered nondiscriminatory reason before ruling, failed to consider defense counsel's attempt to clarify the record, and failed to evaluate whether the prosecution's race-neutral explanation was credible. (*Salinas, supra*, 77 Cal.App.5th at pp. 31-36.) Here, as discussed, the trial court's ruling and analysis contained no such deficiencies.

Then, applying de novo review (which we decline to do here), the court in *Salinas* discerned evidence of pretext based on facts that are absent here. Specifically, the prosecution exercised five of its eight peremptory challenges against Black jurors, and the excluded juror did not actually give " 'push back' " on a hypothetical as the prosecution claimed, while another juror *did* substantially pushback on the hypothetical but was not excluded. (*Salinas, supra*, 77 Cal.App.4th at pp. 24, 27-33, 37-38.) In contrast, the record here does not indicate that the prosecution excluded any other Black candidates, and Ms. S. did, in fact, push back on the hypotheticals, significantly more than any other juror. For these reasons, *Salinas* does not compel a different result here.

13

## 2. *Comparative juror analysis*

Defendant argues that the prosecutor's explanations were not genuine because Juror No. 10 gave similar responses to Ms. S. regarding circumstantial evidence. As defendant insists that Juror No. 10 and Ms. S. were virtually indistinguishable, but for their race, he argues that the prosecutor's rationale was therefore not credible and her decision to exclude Ms. S. was racially motivated.

"When a court undertakes comparative juror analysis, it engages in a comparison between, on the one hand, a challenged panelist, and on the other hand, similarly situated but unchallenged panelists who are not members of the challenged panelist's protected group. [Citation.]" (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1173.) "[C]omparative juror analysis is but one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination. . . . Thus, evidence of comparative juror analysis must be considered in the trial court and even for the first time on appeal if relied upon by the defendant and the record is adequate to permit the urged comparisons." (*Lenix, supra*, 44 Cal.4th at p. 622.) However, "comparative juror evidence is most effectively considered in the trial court where the defendant can make an inclusive record, where the prosecutor can respond to the alleged similarities, and where the trial court can evaluate those arguments based on what it has seen and heard. . . . Defendants who wait until appeal to argue comparative juror analysis must be mindful that such evidence will be considered in view of the deference accorded the trial court's ultimate finding of no discriminatory intent." (*Id*. at p. 624.)

Further, "comparative juror analysis on a cold appellate record has inherent limitations." (*Lenix, supra*, 44 Cal.4th at p. 622, citing *Snyder v. Louisiana, supra*, 552 U.S. at p. 483.) " '[T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words. That is seen below, but cannot always be spread upon the record.' [Citation.]" (*Lenix*, at p. 622.) Thus, "[t]wo panelists might give a similar answer on a given point. Yet the risk posed by one panelist

14

might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding." (*Id*. at p. 624.)

Defendant asserts for the first time on appeal that Juror No. 10's responses to the circumstantial evidence queries were effectively the same as Ms. S.'s responses, raising doubts regarding the prosecutor's race-neutral rationale for exclusion. At the outset, we reiterate that a comparative juror analysis may only be probative where the unchallenged panelist is not a member of the same protected group as the challenged panelist. (*People v. Gutierrez*, *supra*, 2 Cal.5th at p. 1173.) While defendant represents that Juror No. 10 was not African-American, and the Attorney General does not challenge this characterization, defendant fails to support this assertion with a record citation. "It is the duty of counsel to refer us to the portion of the record supporting [defendant's] contentions on appeal. [Citations.]" (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738; *People v. Hyatt* (1971) 18 Cal.App.3d 618, 624 [where brief fails to specify portions of record supporting factual assertions, record is presumed to support trial court's rulings].) As defendant failed to establish with record citations that Juror No. 10 is not in the same protected category as Ms. S., a key threshold question, we cannot fully assess the merit of any comparative juror analysis.

However, even assuming Juror No. 10 was not African-American, the record reveals that they were distinct from each other in multiple ways, diminishing the persuasive effect of any comparative analysis. Ms. S. was a retired accountant, widow, and a mother, grandmother, and great-grandmother who had previously served on a jury. Juror No. 10 was single, employed as a process engineer, had no children, her stepfather was a retired officer from the Stockton Police Department, and she had never served as a juror. Thus, their "training, employment, prior jury service, and experience" were dissimilar. (*People v. Johnson* (1989) 47 Cal.3d 1194, 1220, overruled on other grounds

15

in *People v. Gutierrez, supra*, 2 Cal.5th at p. 1174.)  Moreover, their responses to questions regarding their personalities and abilities to deliberate within a group differed. Ms. S. admitted she could have "control issues" when "put in a corner or something like that," while Juror No. 10 stated she was "independent," and confirmed she would neither "push nor be pushed."  And unlike Ms. S., Juror No. 10 did not ask the prosecutor what she wanted her to say, or otherwise question whether she should reveal her true thoughts, during voir dire.

Accordingly, the two candidates differed in numerous respects, rendering any comparative analysis of limited use.  (See *People v. Winbush* (2017) 2 Cal.5th 402, 443 [pretext is established "when the compared jurors have expressed 'a substantially similar *combination* of responses,' in all material respects"], original italics.)  This is particularly true here, where there is a single discriminatory challenge, the record reveals a " 'sound, objectively plausible basis' " for the challenge,[6] and we must credit " 'the legitimate role that subjective factors may have in a prosecutor's decision' to challenge or not challenge jurors peremptorily." (*People v. Williams* (2006) 40 Cal.4th 287, 313.)  Thus, a comparison of the two jurors is insufficient to support defendant's claim that the trial court erred in denying his *Batson/Wheeler* motion.

---

[6]    As discussed above, the record shows that Ms. S. and Juror No. 10 did not give similar answers to the prosecutor's questions on the issue of circumstantial evidence. Ms. S.'s answers suggested that she resisted accepting all of the facts in the prosecutor's hypotheticals to make an inference based on circumstantial evidence and indicated that she  "need[ed] more" than the facts in the hypotheticals to determine intent.  Although Juror No. 10 initially agreed with Ms. S. that she could not judge what someone was thinking, she clarified that she could do so by looking at what happened before the event and "examin[ing] everything that's in front of [her]."

16

## II

### *Trial Court's Denial of Self-Defense Jury Instruction*

Defendant next contends the trial court erred by refusing to instruct the jury on self-defense. He avers that there was substantial evidence to support the instruction because Asad testified that he believed gunfire came from both defendant's and Harvey's cars, only three or four bullets were accounted for, and Harvey had motive to harm defendant. We find no error.

A.      *The trial court's ruling*

During trial, defendant argued that a self-defense instruction was proper based on Asad's testimony that gunfire might have come from both cars. After the trial court reviewed Asad's testimony, it found that there was no evidence that defendant had a "genuine and honest belief that he was in imminent danger of death or great bodily injury from an unlawful attack" such that his conduct was necessary to prevent such an injury. It accordingly denied defendant's request for the instruction.

B.      *Applicable legal principles*

Upon a defendant's request, the trial court must issue a jury instruction where there is substantial evidence to support the instruction. (*People v. Stevenson* (1978) 79 Cal.App.3d 976, 985; see *People v. Elize* (1999) 71 Cal.App.4th 605, 615.) In this context, to determine whether the evidence is sufficient to warrant a jury instruction, the court does not assess credibility, but only whether the evidence, if believed by a jury, would be sufficient to raise a reasonable doubt. (*People v. Mentch* (2008) 45 Cal.4th 274, 288.) The court resolves any doubts regarding the sufficiency of the evidence to warrant an instruction in defendant's favor. (*People v. Eid* (2010) 187 Cal.App.4th 859, 879.) However, "[t]he trial court need not give instructions based solely on conjecture and speculation." (*People v. Young* (2005) 34 Cal.4th 1149, 1200.)

"To justify an act of self-defense . . . . , the defendant must have an honest *and reasonable* belief that bodily injury is about to be inflicted on him. [Citation.]'

17

[Citation.]  The threat of bodily injury must be imminent [citation], and '. . . any right of self-defense is limited to the use of such force as is reasonable under the circumstances. [Citation.]'  [Citations.]"  (*People v. Minifie* (1996) 13 Cal.4th 1055, 1064-1065, original italics; CALCRIM No. 3470.)

Instructional errors are questions of law, which we review de novo.  (*People v. Guiuan* (1998) 18 Cal.4th 558, 569-570.)

C.      *Analysis*

In this case, substantial evidence did not support an instruction on self-defense. Defendant's proposed self-defense theory was that Rayleen or Harvey shot at defendant, causing defendant to shoot at their car in self-defense.  Crucially, however, there is no evidence that any of the occupants of Harvey's car had a firearm at the time of the incident.  Rayleen testified that no one in the car had a firearm and that no one in their car shot at defendant.  The police did not recover any firearms from the vehicle nor book any firearms into evidence.  Moreover, a search of defendant's vehicle revealed no bullet holes, blood, or any other circumstantial evidence that might indicate someone had fired a gun from the vehicle at defendant.  And, contrary to defendant's contention, the fact that only three to four bullets were accounted for, while Rayleen and Asad testified there may have been five or six gunshots, does not constitute evidence that unaccounted for gunshots, if any, came from both cars.

Next, although defendant argues that Asad's testimony provided a basis for the instruction, Asad admitted that his statements indicating gunshots came from both cars were pure speculation.  In Asad's 911 call, the dispatcher asked whether there was "more than one car shooting," to which Asad responded, "Yes, um I'm not too sure it just sounded like gun shots right in front of me.  And it was right in the middle of the street." When the dispatcher asked if both cars were struck by the bullets, Asad said, "I believe so, um that's because I saw glass on the floor.  When I passed by."  However, Asad testified that he did not see any windows break and did not know where the glass came

18

from or if it was in the street before the shooting. Asad also testified that he did not see a gun and did not know which car the gunshots came from. Further, although he testified that the gunshots "sounded like return fire," he then clarified that he did not know how many cars were shooting, and that was "assuming" and "speculating" that gunshots came from both cars. As a result of Asad's statements, the trial court granted the prosecutor's motion to strike all references to "return fire" from Asad's testimony on the grounds that it was speculation. On redirect examination, Asad agreed he was speculating about gunshots from both cars and said, "I speculated when I called [911,] too." He explained he "was in a panic" when he called 911, but that he has heard two different guns firing before, and the gunshots he heard on that day "all sounded the same." Finally, the police officer who initially spoke to Asad testified that Asad did not tell him that he heard or saw more than one gun. Thus, Asad's testimony did not constitute substantial evidence of gunshots from Harvey's car, and therefore did not supply sufficient evidence to support a self-defense instruction.

Additionally, there was no substantial evidence that defendant had an honest and reasonable belief of imminent bodily injury. Defendant did not testify, and thus did not attest to his state of mind. The fact that defendant was dating the mother of Harvey's child did not provide a basis for imminent fear of bodily injury, nor did Harvey's statement to Rayleen in the car, which defendant did not hear, " 'Look at that bitch ass [N-word].' "[7] And, even if the jury had been permitted to consider Asad's speculative

_____

**7** Defendant also relies on testimony regarding a confrontation between defendant and Harvey, taken from an evidentiary hearing, to argue that Harvey had motive to shoot at defendant. As the evidentiary hearing was held outside the jury's presence, the witness's testimony at the hearing cannot provide evidentiary support for a self-defense instruction. Moreover, defendant's confrontation with Harvey three months prior, in which *defendant* pointed a gun at Harvey, does not provide evidence that defendant was in reasonable, imminent fear of harm while alone in his own car, weeks later, at the time of the shooting. Especially when defendant was the one who pursued Harvey's vehicle.

19

testimony about return fire, Asad did not testify as to who he believed fired first. Without substantial evidence that defendant reasonably believed he was in imminent fear of bodily injury prior to shooting, the trial court did not err in declining to issue the self-defense instruction.

As substantial evidence did not support a self-defense instruction, the trial court did not violate defendant's due process right to present a complete defense when it refused to give the instruction. (*People v. Eid, supra*, 187 Cal.App.4th at p. 879 [a criminal defendant is entitled to instructions on a defense theory only if the theory is supported by the law and evidence].)[8]

### III

### *Assembly Bill 124*

In a supplemental brief, defendant argues that he is entitled to resentencing under Assembly Bill 124. The People agree that Assembly Bill 124 applies retroactively, but insist that remand is unnecessary because the trial court implicitly found that imposing the lower term would be contrary to the interests of justice. We conclude defendant is entitled to remand for resentencing under the new law.

Assembly Bill 124, which became effective January 1, 2022, made changes affecting trial court sentencing discretion, including the ability to impose the upper term for a conviction. (Stats. 2021, ch. 695, § 5.3.) Among other things, Assembly Bill 124

---

[8] Defendant also argues that the trial court's refusal to give the self-defense instruction was "aggravated" by the trial court's statement to the jury during closing arguments that there was no evidence of gunfire coming from the car. The trial court made no such statement. Rather, it sustained two of the People's objections on the grounds that defense counsel misstated the evidence when he said "it was [Asad's] impression . . . that there was more than one [gun] going off. That the cars were shooting at each other," and "[i]t was clear to [Asad] or he believed that there were shots that were coming from two cars." Defense counsel accordingly told jurors that they could read the 911 transcript for themselves.

sets a presumption that the trial court will impose the lower term under enumerated circumstances, such as where an offender's childhood trauma or youth were contributing factors in the offense. (Stats. 2021, ch. 695, § 5.3.)

Under *In re Estrada* (1965) 63 Cal.2d 740, "[w]hen the Legislature has amended a statute to reduce the punishment for a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date." (*People v. Brown* (2012) 54 Cal.4th 314, 323, fn. omitted.) This presumption has been extended to amendments providing trial courts discretion to impose lesser punishment at sentencing and amendments reducing the possible punishment for classes of persons. (See, e.g., *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 303-304 [Prop. 57, as approved by voters, Gen. Elec. (Nov. 8, 2016)]; *People v. Garcia* (2018) 28 Cal.App.5th 961, 971-972 [Senate Bill No. 1393 (2017-2018 Reg. Sess.)]; *People v. Valenzuela* (2018) 23 Cal.App.5th 82, 87-88 [Senate Bill No. 620 (2017-2018 Reg. Sess.)].) Nothing in Assembly Bill 124 suggests a legislative intent that the amendments apply prospectively only, and defendant's case is not yet final. (*People v. Vieira* (2005) 35 Cal.4th 264, 305-306.) Thus, we agree with the parties that Assembly Bill 124 applies retroactively to nonfinal cases such as defendants.

Here, defendant was 24 years old at the time of his crimes and was sentenced to the middle term. He therefore qualifies as a youth under Assembly Bill 124 and, as a result, is entitled to a presumption in favor of a low prison term. (§ 1170, subd. (b)(6)(B).) The People argue that the trial court expressly considered defendant's youth at sentencing and still determined that the middle term was appropriate, rendering remand for resentencing futile. We disagree.

" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion"

than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' [Citation.] In such circumstances, [our Supreme Court has] held that the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' [Citations.]" (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

Here, there is no clear indication that the trial court would have sentenced defendant to the middle term if it had been bound by the new requirements under Assembly Bill 124. Although the trial court did consider the defendant's youth at sentencing, it did not apply a presumption in favor of the lower term, nor did it determine, as Assembly Bill 124 now requires, that imposing the lower term would go against the interests of justice. Thus, we find that remand for resentencing is appropriate. (See *People v. Buycks* (2018) 5 Cal.5th 857, 896, fn. 15.)

### DISPOSITION

The judgment of conviction is affirmed. The case is remanded to the trial court for resentencing, consistent with the changes made by Assembly Bill 124.

      KRAUSE      , J.

We concur:

      BLEASE      , Acting P. J.

      RENNER      , J.